*In re* Estate of Abraham M. Saperstein, Deceased.—(Sylvia Saperstein *et al.*, Respondents-Appellants, *v.* Martin L. Silverman *et al.*, Petitioners-Appellees.)

(No. 59064;

First District (4th Division)—November 27, 1974.

Mark S. Lieberman and Jack B. Schmetterer, both of Gottlieb and Schwartz, of Chicago, for appellants.

Ira D. Schultz, of Chicago (Sidney Z. Karasik and Gary E. Dienstag, of counsel), for appellees.

Mr. JUSTICE BURMAN delivered the opinion of the court:

This appeal arises from a petition filed in the Probate Division of the Circuit Court asking that court to allow a fair and reasonable sum as

fees for services rendered by Allan R. Bloch as attorney for the estate of Abraham M. Saperstein, deceased. Allan R. Bloch died before the administration of the estate was completed and the petition for fees was therefore filed by the executor of Bloch's estate and by attorneys, Martin L. Silverman and Beryl A. Birndorf, former law partners of Bloch. The respondents herein whose interests comprise 88% of the estate of Abraham Saperstein, objected to the petition for fees. After a lengthy evidentiary hearing, the trial court determined $140,000 to be a fair and reasonable fee and awarded petitioner that amount. The respondents bring this appeal contending solely that the amount awarded by the trial court, in addition to other amounts totaling $123,000 previously received by attorney Bloch, is unreasonable and excessive.

During an extensive hearing on the contested petition for fees in the probate division, much evidence was adduced relating to the amount and nature of the services performed by Allan R. Bloch in regard to the administration of the Superstein estate, and whether those services supported the amount of fees awarded. Our determination necessitates a review of that evidence.

Abraham M. Saperstein (Saperstein) died testate on March 15, 1966. Named as co-executors in his will were Allan R. Bloch (Bloch) and the Continental Illinois National Bank and Trust Company of Chicago (Continental or "the bank"). The executors engaged Bloch's law firm, Bloch, Birndorf, and Silverman to represent them in the administration of the estate.

Among the assets of Superstein was the world renowned "Harlem Globetrotters" exhibition basketball team. It was originally organized in Chicago by Superstein in 1926 as the "Savoy Big Five." It was renamed the Harlem Globetrotters in 1927, and was owned and operated by Saperstein during his life as a sole proprietorship. When Superstein died, the co-executors Bloch and Continental had the obligation of managing his affairs, including operation of the Globetrotters. As will be discussed further below, they initially incorporated the enterprise on April 4, 1966, and eventually arranged for its sale in June, 1967.

Marie Linehan was Saperstein's personal secretary for more than 20 years and handled most of the operational work for the team. She testified on behalf of petitioners. She stated that at the time of Saperstein's death, the Globetrotters, who had traveled to 87 countries around the globe, were comprised of two teams of eight or nine players apiece, or a total of 19 or 20 professional players. Out of these men, there were four key players or "stars." Meadowlark Lemon was "key clown, key performer" with one unit, and Fred Neil was second on that unit. He was regarded as a "highly skilled dribbler and basketball player." On the other unit the

two key men were Robert Hall and Hubert Ausbie, both comics with great basketball skill. None of these four stars was under written contract at the time of Saperstein's death.

Linehan further stated that Allan Bloch had, during Saperstein's life, continuously acted as attorney for Saperstein and the Globetrotters, and had become thoroughly familiar with the operation of the teams. He had represented Saperstein and the Globetrotters in infringement cases and handled all contractual work with television networks as well as personal legal matters for the individual team members. He traveled with the club on various occasions overseas and in this country. According to her, Bloch immediately upon Saperstein's death actively took over "responsibility" for the Globetrotters and continued to do so until it was sold. He procured the signatures of the four stars on written contracts. He visited Europe during the summer of 1966 in advance of the club to reassure the European promoters that the Globetrotters operation would continue. Bloch visited the Globetrotters' office in Chicago several times a week and Linehan called him "virtually every day."

Under cross-examination she testified that she was thoroughly familiar with the operation of the club and that she could conduct the operational work for the teams, e.g., booking games and making arrangements for special transportation. She considered herself the office manager. Other people who had done bookkeeping, scheduling, publicity and advance work, and coaching, or who acted as equipment manager, business manager, announcer, driver, prop man, and road manager for the Globetrotters organization during Saperstein's life remained with the teams after his death. Bloch, however, took over Saperstein's responsibility of making the critical decisions. During his visit to Europe in the summer of 1966, Bloch not only reassured the promoters of a continuing relationship, but he also did some scheduling. Bloch dealt with whatever problems would arise in connection with the teams or their operation. As to Bloch's signing the stars to a written contract, she was not aware of any difficulty encountered by him in that endeavor, and all the stars received an increase in salary. They had in previous years signed written contracts which contained reserve clauses.

Anthony J. Morrone, an attorney since 1957, was in charge of the Saperstein estate on behalf of Continental Bank as co-executor. He was a trust officer of Continental and had been employed by the bank for 15 years in the estate administration department, which is responsible for the bank's probate matters. He testified as a witness for the petitioners. He discussed the assets of the estate with Bloch before they were officially appointed as co-executors and was told by him that the main asset was the Globetrotters. Morrone stated that in his experience he

never had occasion to operate a sole proprietorship business the nature and value of the Globetrotters and that neither he nor anyone else in the bank had any experience in the handling of a similar estate. It was, in his opinion, a highly unique and unusual estate presenting peculiar problems.

A provision in the will allowed for incorporation of the Globetrotters in the discretion of the executors, and Bloch and Morrone decided that this should be done to limit potential liability and to gain tax advantages for the estate. Accordingly, Abe Saperstein Enterprises, Inc., was formed on April 4, 1966, and the proprietorship assets were transferred to the corporation in exchange for all of its stock. The board of directors of the corporation was composed of seven people: Block, Silverman (one of Bloch's law partners), Morrone, Charles Lenz (also from Continental), Marie Linehan and William Margolis—long time employees of Saperstein—and the decedent's widow. The latter was made chairman of the board, but Bloch was chief operating officer. Legal services in creating the corporation, as well as all other legal work required in connection with the operation of the estate during the first year, were rendered by Bloch, Birndorf and Silverman. Morrone contacted them "very frequently" and Bloch "almost every day." Bloch secured written contracts for the key players.

Since Saperstein's death had come at an inopportune time in terms of cash flow and the estate was cash poor when his will was first admitted to probate, Continental borrowed $50,000 from its own commercial department on May 10, 1966, in order to get the estate started. The cash requirements of the estate tax to be paid were such that Bloch and Morrone decided that the teams would have to be sold. This was one reason why Bloch felt it important to sign the key players to written contracts, because without such contracts it would be difficult to sell the teams. The first offer of purchase came from Metromedia about 6 months after the death of Saperstein. Bloch conducted the negotiations at the outset and received an initial offer of $3 million.

The co-executors filed a petition in the probate division of the circuit court on May 29, 1967, asking that a contract between them and Metromedia for the sale of the Globetrotters at that amount be approved, or, in the event that prior to the entry of any final order authorizing sale of the Globetrotters, other offers or contracts were presented to the court for the purchase thereof, that the court approve the offer or contract which would be in the best interests of the estate. Subsequently other offers were made. A group headed by Potter Palmer made a higher cash bid, and Bloch and Morrone conducted negotiations with that group. Another offer was received from a group headed by Jack Brick-

house. Lin Broadcasting also made an offer consisting partly of cash and partly of convertible debentures and stock in the new subsidiary which would be organized to run the teams. The Potter Palmer cash bid of $3,710,000 was finally approved in open court on June 8, 1967, by Judge Dunne. Since the Saperstein family wished to retain ownership of the teams they had favored the Lin offer, and engaged independent counsel, Gottlieb and Schwartz, to represent their interests at the hearing, but the court found the Potter Palmer bid to be "the highest and best offer received by the Co-executors"

The federal estate tax return filed by the co-executors for the Saperstein estate placed the value of the Globetrotters at $2 million at date of death, and that figure was ultimately accepted by the government. Morrone felt an increase in value during the 15 months between Saperstein's death and the sale of the teams was due to the fact that the co-executors demonstrated, by using good business procedures and cutting costs, that the enterprise could be operated at a profit. The absence of key players' contracts at Saperstein's death also affected the value. During negotiations with the Potter-Palmer group, a member of that group, George Gillette, had asked Morrone and Bloch if there were contracts with the key players and they assured him that there were.

Certain fees totaling $123,000 were paid to the firm of Bloch, Birndorf, and Silverman from Abe Saperstein Enterprises, Inc., pursuant to corporate resolution during the period of February 28, 1967, to October 19, 1967. These amounts were as follows:

| | |
|---|---|
| February 28, 1967 | $27,000 |
| April 10, 1967 | $ 1,000 |
| May 8, 1967.. ' | $ 1,000 |
| July 7, 1967 | $ 2,000 |
| August 7, 1967 | $ 1,000 |
| September 11, 1967 | $ 1,000 |
| October 19, 1967 | $90,000 |

Another payment to Bloch, Birndorf, and Silverman from the assets of the estate in the amount of $10,000 had been made on November 4, 1966. A credit was taken on the corporate income tax return for the $123,000 paid out to Bloch, Birndorf, and Silverman.

When preparing the federal estate tax return, Morrone asked Bloch what his fee would be and Bloch said $140,000. When Morrone filed the federal estate tax return he therefore deducted a figure of $140,000 for "estimated" attorney's fees to be paid to Bloch's firm as an expense of administration. He said he knew at that time that $123,000 had already been paid to Bloch by the corporation, pursuant to corporate resolution, and that the $140,000 was in addition to that amount, to be charged to

the estate. He further stated that he had about 300 estates under his jurisdiction pending in court at the time. Almost all these estates were valued at over $60,000 and thus required the filing of a federal estate tax return. Based on his experience he was of the opinion that under the unique circumstances, the total amount of fees of $263,000 was fair and reasonable.

Under cross-examination Morrone testified that a $35,000 fee paid to the law firm of Gottlieb and Schwartz, for services it performed for the estate in regard to tax matters at the request of the Saperstein family, was approved by corporate resolution on September 29, 1967. The $90,000 fee paid out to the firm of Bloch, Birndorf, and Silverman, on October 19, 1967, and authorized in the same resolution was for services rendered by Bloch as "chief operating officer of the corporation." Bloch was on 24-hour call by the corporation, and "whenever [it] had a question to ask, they [sic] would call him, and he performed services above and beyond the duties that he had as attorney for the estate and as co-executor, and he billed the corporation for those services." Morrone voted for the fees as a director of the corporation because he felt they were reasonable in light of the services performed by Bloch—"he spent considerable time, * * * went to Paris, and * * * he was completely devoted to seeing that this was a success * * *."

The $27,000 payment to Bloch, Birndorf, and Silverman, authorized by the corporation on February 28, 1967, was for a myriad of duties performed by Bloch for the corporation up to that time—e.g., drawing contracts, scheduling, conferring about tax problems. The $1000 payments were monthly retainers. Morrone did not know what transpired during negotiations between Bloch and the star players regarding the written contracts.

The bank's own co-executor fee of $90,000 was higher than normal because the assets of the estate were unique requiring additional services by it. In addition, Morrone reiterated that the total amount of fees paid out were reasonable taking into consideration the complexities of the estate, the size, the uniqueness of a sole proprietorship unfranchised basketball team with players not under contract and the problems in finding a buyer for a team which "only had a name and a bunch of players."

On re-direct examination it was established that since the $140,000 deduction for attorney's fees on the federal estate tax return was disallowed by the government—the usual procedure where fees have not yet been paid or determined—a claim for tax refund was later filed on behalf of the Saperstein heirs. This refund, filed by Gottlieb and Schwartz, re-estimated deductible attorney's fees at $180,000 rather than the previous $140,000. Morrone testified on re-cross, however, that it is usual and

normal to file a claim for refund setting forth the maximum amount allowable under any conceivable set of circumstances.

Charles W. Lenz, a commercial banking officer for Continental who had been employed by it for 21 years, also testified for the petitioners. He was employed as a financial analyst in Continental's Trust Department at the time he was involved with the Saperstein estate and handled about 150 or 200 closely held corporations a year. During his 12-year experience in that position with almost every type of business imaginable, he had never encountered a business like the Globetrotters,—a sole proprietorship non-league, non-franchised sports activity. He detailed at length various problems which arose as a result of the Globetrotters being outside of an established league or franchise, including scheduling, location of game sites, publicity, and obtaining players without the benefit of a "draft" system.

Soon after Saperstein's death, he was contacted by Morrone and he estimated that "if we just closed the doors [and liquidated the business], that we could possibly get something in the area of $200,000 in cash" for the equipment and the like. The key to a successful sale, he said, would be (1) incorporation of the entity, (2) the signing of certain key players, and (3) the successful completion of the American and European tours to show that the operation was profitable. Upon the death of a strong sole proprietor an organization could completely collapse. They had to show potential investors that the organization was "alive, well, and profitable." That was why the insistence on a corporation and why Meadowlark Lemon was signed by Bloch to a long-term contract. Allan Bloch ran and managed the operation of the Globetrotters until it was sold. Lenz did not consider himself qualified to run the teams, and he felt no-one else in the Globetrotters' organization could do so. A strong individual who knew the whole operation was required, and Bloch was the man. He was of the opinion that signing of the stars by Bloch substantially increased the value of the Globetrotters.

For the full fiscal year that Bloch ran the Globetrotters with the bank, the net income before taxes was in excess of $400,000. The net profits before taxes for the 3 years preceding Saperstein's death were $57,000, $40,000, and $84,000. Lenz participated in the negotiations regarding the sale of the Globetrotters. A balance sheet covering the period of October 1, 1966, to April 30, 1967, and showing a net profit before taxes of $666,884 and after taxes of $382,061, was made available to prospective purchasers.

Under cross-examination Lenz said he began analyzing the values of businesses in 1958 and he had previously been called upon to analyze the value of about two or three sole proprietorships a year. He stated that a sole proprietorship is unique because it ceases as an entity at

the date of death, whereas a corporation may have perpetual life. The amount of good will built up by Saperstein would continue only to the extent that the Globetrotters as an entity could be continued as a profitable enterprise. He had no background to determine whether the executors could operate profitably. Rather than liquidate, the executors took a risk that the Globetrotters could continue as a viable entity upon incorporation under Bloch's management. In the tax valuation report prepared by him in 1967 for estate and inheritance tax purposes, the fair value of the business as of March 15, 1966, was placed at $2 million, which reflected the figures of the three previous operational years. This was his opinion of the Globetrotters' value at the date of Saperstein's death based on his observation of the teams' money-making ability subsequent to Saperstein's death. He described in technical detail how he arrived at the $2 million figure. He had originally started with a valuation of between $200,000 and $500,000 but revised it upwards as the profit performance developed. Corporate earnings after tax for the period April 4, 1966, to April 30, 1967, were $322,000 or more than nine times the average annual earnings (assuming after corporate taxes) of $38,000 for 1963, 1964 and 1965.

The sale took place approximately 15 months after the date of death, when the organization was incorporated and the business was highly profitable. The difference between the date of death figure of $2 million and the sale price of $3,710,000 was due to the entity's profitability. The earnings were increased almost 10 times with only a 10% increase in gross receipts through a tightening up of the whole organization, including a sharp reduction in operating expenses. Lenz agreed that Saperstein's death produced tremendous publicity throughout the world, and that in certain situations there was free publicity because of that fact.

The respondents called Martin L. Silverman as an adverse witness pursuant to section 60 of the Illinois Civil Practice Act. He was admitted to the Illinois bar in 1951 and was a member of the firm of Bloch, Birndorf, and Silverman. He testified that the firm maintained some time records in connection with the representation of the Saperstein estate, but they did not accurately reflect the time expended. He did not have any of the time records in court because he was not requested to bring them. Silverman further stated that Bloch did not ordinarily use time sheets because of the nature of the work he was frequently involved in.

Charles D. Stein testified next for the respondents. He had practiced law since 1947 and was a partner in the firm of Gottlieb and Schwartz until 1969, and afterwards was "of counsel" for that firm. He stated that he had a conversation with Allan Bloch regarding fees in connection with the representation of this estate in the latter part of September 1967.

Bloch told him that he thought a fair fee for his services would be $140,000. Bloch asked what Gottlieb and Schwartz would ask for a fee, and Stein told him $35,000. Bloch then suggested that his $140,000 fee be allocated between the corporation and the estate on the basis of $90,000 to the corporation and $50,000 to the estate since the services were overlapping. Bloch told him, too, that he was also currently charging $1,000 a month for general corporate services which included drafting contracts, conferring with the office, and general corporate work. Under cross-examination Stein said he never spoke to Birndorf or Silverman about fees before Allan Bloch died on January 29, 1969, or before the controversy regarding attorney's fees had developed.

After deliberation, the court found that Bloch, Birndorf, and Silverman were entitled to a $140,000 fee as attorneys for the Saperstein estate, and that since $10,000 had already been paid from the estate, that $130,000 was still due and owing the firm. The court expressed orally the basis for its finding to be the $140,000 amount listed in the federal estate tax return as estimated attorney's fees; the claim for refund filed by Gottlieb and Schwartz stating that the estate claimed a deduction of $140,000 for attorney's fees, but that the actual amount of fees paid or to be paid should be $180,000; the testimony of bank officers who have handled hundreds of estates that this was a unique and unusual estate and that the $140,000 fee was fair and reasonable; and the testimony and exhibits disclosing that the value of the Globetrotters was increased from $2 million to $3,710,000 through the efforts of attorney Bloch.

As noted in respondents' reply brief, there is little, if any disagreement between the parties as to the substantive content of the applicable law. Compensation for attorneys in estate matters is governed by section 337 of the Probate Act (Ill. Rev. Stat. 1971, ch. 3, par. 337), which ordains:

> "The attorney for an executor, administrator, administrator to collect, guardian, or conservator shall be allowed reasonable compensation for his services."

■■ Both parties cite *In re Estate of James*, 10 Ill.App.2d 232, 134 N.E. 2d 638, for the proposition that a determination of whether such a fee is "reasonable" must be based on the facts and circumstances of each individual case and no hard and fast rule can be or has been laid down. "There are many cases in our Supreme and Appellate Courts determining the reasonableness of fees, but each case had its own peculiar facts and circumstances, and what would be reasonable in one could be unreasonable in another." (10 Ill.App.2d 232, 241, 134 N.E.2d 638, 642.) Certain factors to be considered, however, have been set out by the First District Appellate Court opinion in *In re Estate of Jaysas*, 33 Ill.App.2d 287, 179 N.E.2d 411, and are pointed to by the parties. These include:

" * * the size of the estate, the work done and the skill with which it was performed, the time required, and the advantages gained or sought by the services or litigation. Good faith, diligence and reasonable prudence should be included, so as to prevent, on the one hand, excessive charges, and, on the other hand, inadequate allowances." 33 Ill.App.2d 287, 292, 179 N.E.2d 411, 413.

Finally, it cannot be questioned as a general proposition that, although a reviewing court has the power to modify the amount of a fee awarded, the award is a matter peculiarly within the province of the trial court and only where there is a "plain case of wrongful exercise of judgment" (*In re McCalmont*, 16 Ill.App.2d 246, 256, 148 N.E.2d 23, 28), or where the determination of the trial court is "manifestly or palpably erroneous" (*In re Estate of James*, 10 Ill.App.2d 232, 242, 134 N.E.2d 638, 643) or a "clear abuse of * * * discretion" (*Hofing v. Willis*, 83 Ill. App.2d 384, 389, 227 N.E.2d 797, 799) will a reviewing court alter its finding.

The sharp difference of opinion between the parties lies in their disparate evaluation and emphasis of certain facts in the record, and in their conflicting attitude regarding whether the circuit court judge did overstep the bounds of his discretion. After a careful scrutiny of the record before us, we find sufficient facts to support the trial court's award, and we cannot say that it amounts to a clear abuse of discretion.

An unraveling of the evidence discloses that Allan Bloch did unquestionably perform substantial non-legal and legal services for the estate. At Saperstein's death the Harlem Globetrotters operation, run by Saperstein as a sole proprietorship, was in a difficult position. Bloch, who had worked with Saperstein during his life on various problems related to the Globetrotters operation, stepped in and, without objection from any source—indeed with everyone's approval—took on the immense responsibility of insuring the teams' continued vitality. Morrone testified that neither he nor anyone at Continental—the institutional co-executor on whose behalf Morrone was involved with the estate—had any experience in the operation of such an enterprise, and that it presented an unusual and unique problem. Although the same operational staff continued on with the Globetrotters, Bloch was saddled with the responsibility of making the critical decisions. At Saperstein's death the key players were not under contract, there were insufficient funds for operating expenses, and negotiations with promoters for the teams' planned European tour were incomplete. According to Lenz, Continental's financial analyst, if the teams were to cease operation at that point, the tangible assets could have been sold for about $200,000.

In considering the actual "work done" by Bloch as one criteria for

determining a reasonable fee, respondents emphasize what was not done by him. They point to testimony that indicates that co-executor Continental did the inventory, accounts, and tax returns, and that no legal services were required of Bloch in connection with the loan made from Continental to the Globetrotters to get the estate started. They also stress that the absence of any time records deprived the court of the only objective factor available in calculating a reasonable fee. Testimony establishes, however, that Bloch was considered chief operating officer of·Abe Saperstein Enterprises, Inc., the corporation formed to run the Globetrotters. In taking over responsibility for the teams, he visited the Globetrotters' office "several times a week," and was called by Marie Linehan, who handled much of the operational work, "virtually every day" until the teams were sold. Bloch's law firm rendered legal services in setting up the corporation and performed "all [other] legal work in connection with the operation of the estate," including the corporation, during the first year. Morrone, on behalf of co-executor Continental contacted the firm "very frequently" and, at the beginning, Bloch "almost every day." Bloch also went to Europe in 1966 to reassure the European promoters of a continued relationship and also did some scheduling there. He procured the signatures of the key players on written contracts, and, despite a conflict as to time and effort that went into that endeavor, it was deemed crucial from the standpoint of the teams' security and saleability. Bloch was further involved in negotiations with various groups regarding the sale of the teams, which was finally arranged in June 1967.

Both parties also discuss the factor of the advantages gained by the services rendered by Bloch. In this regard there is no dispute that the net worth of the teams in terms of after tax income was increased nearly tenfold in the first year after Saperstein's death over what it had averaged in the 3 years previous to his death. Nor is there any dispute that the date of death valuation of the Globetrotters for estate tax purposes, accepted by the government, was $2 million ̇and that the enterprise was sold a little over a year later for $3,710,000. The parties differ, however, in analyzing the significance of these facts.

The respondents emphasize that while earnings did increase almost 10 times, total receipts increased only 10%. They thus play down the increased income of the Globetrotters' operation and attribute it to a "sharp reduction in operating expenses," arguing that this was made possible largely because of the tremendous amount of publicity generated free of charge by the death of Saperstein—a popular and well-liked individual. The difference ·between the date of death value of $2 million and the sale price of $3,710,000 is not seen as attributable to Bloch's efforts, since it is claimed that the bidders were unmoved by the profit picture and

that the bidding generated its own enthusiasm. They point out that the first bid received was for $3 million. Moreover, the $2 million figure is not considered by them an accurate valuation at date of death, because it was chosen for a very limited tax purpose and was consequently somewhat artificial.

The evidence, however, reasonably supports the petitioners' argument that the Globetrotters' net worth increased substantially, due largely to Bloch's efforts. Saperstein's death occurred in March, 1966, and the beginning of the profitable United States tour, as conducted by the corporation, did not commence until the following October—a sufficient lapse of time to dissipate greatly publicity surrounding Saperstein's death. Lenz saw the substantial increase in earnings as being "the direct result of management, over-all tightening up of the operation." The date-of-death value of $2 million was accepted by the government as accurate, and the much higher sale price was considered by both Morrone and Lenz to be a result of the profit performance demonstrated by the Globetrotters after Saperstein's death and the signing of the stars to written contracts. Lenz said a profit and loss statement as of April 30, 1967, was made available to prospective purchasers on their request, and discussions regarding player contracts arose during sale negotiations. It must finally be noted that respondents' attorney himself admitted, in his opening remarks at the trial, that whatever work was done by Bloch was done "skillfully."

Respondents also claim an alleged lack of good faith on the part of petitioners should bear on the fee award. This is grounded primarily on the observation that the petition seeking allowance for fees did not reveal that $123,000 had already been paid to Bloch's firm by the corporation, and that another $10,000 had been received from the estate "on account." We do not believe that such an omission was necessarily indicative of lack of good faith—especially since petitioners brought out these facts themselves through testimony at the hearing. The other bases for the claimed lack of good faith relate to certain allegations in the petition not considered by respondents to have been borne out by the record and thus deemed misleading. The evaluation of these statements as misleading is colored by the respondents' interpretation of the evidence and we do not consider the statements crucial to a determination of the award.

The respondents finally argue that even "assuming the rendition [by Bloch] of skillful services leading to advantageous results," which they "recognize to a limited degree," the figure of $140,000 was chosen arbitrarily by the court. It was determined, they say, because that amount appeared on the estate tax return and the tax refund claim, and respondents detail at length why the figure on those documents is not probative of a fair fee—*viz.*, it might properly have included the $90,000 amount

paid out to Bloch's firm pursuant to corporate resolution and deducted on the corporation's income tax return, and it was an estimated amount in any event, sufficiently large to include all possible contingencies. This argument is premised on the testimony of Stein, associated with the law firm of Gottlieb and Schwartz representing respondents, that Bloch himself intended the $140,000 amount to include the $90,000 paid out to his firm pursuant to corporate resolution and that therefore only $50,000 was due from the estate. This testimony is sufficiently rebutted by the record to warrant its rejection by the court. Morrone testified that the $140,000 was intended to be in addition to that paid out by the corporation. Without detailing the propriety *vel non* of taking the same $90,000 deduction twice—on both the corporation income tax return and on the estate tax return—which the parties discuss at some length, we merely note that the record reflects disagreement as to whether it would have been proper to do so under the facts here. In regard to respondents' assertion that here is "no rational relationship in the record between skillful performance and advantageous results, on the one hand, and the sum of $140,000 on the other," and that the estate tax return and the tax refund claim could not provide the nexus, we stress that the trial court judge also heard the testimony of Morrone that $140,000 was a "fair and reasonable" fee considering all factors involved in the estate. No other witness testified to the contrary. The judge expressed that this opinion was a basis for his determination of the award.

■■ In sum then, based on the record before us and the rule of law that the award of attorney's fees is a matter peculiarly within the discretion of the trial court, we are not prepared to say that the award here, although higher than the many standards proposed by the respondents, was a clear abuse of discretion or manifestly or palpably erroneous. We reiterate that this was an unusual and unique estate, requiring extraordinary and broad-ranging legal and non-legal services by Bloch. We note in closing that Bloch did not request nor did he receive a co-executor's fee.

For the reasons stated the judgment of the circuit court is affirmed.

Affirmed.

ADESKO, P. J., and DIERINGER, J., concur.