58 Ill. App.3d 697 (1978)
374 N.E.2d 699
In re ESTATE OF CORRA E. BROWN, Deceased.  (THE NORTHERN TRUST COMPANY et al., Petitioners-Appellees,
v.
RICHARD A. ELLIOTT et al., Objectors-Appellants.)
No. 76-1286.
Illinois Appellate Court  First District (2nd Division).
Opinion filed February 28, 1978.
*698 James N. Vail, of Chicago, for appellants.
Keck, Cushman, Mahin & Cate, of Chicago (Edward S. Silber, Benno P. Ludwig, and Susan Vitullo Walters, of counsel), for appellees.
Judgment affirmed.
Mr. JUSTICE PERLIN delivered the opinion of the court:
This appeal is taken from the circuit court's award of executor's and attorneys' fees for services rendered in the probate of Corra E. Brown's estate. Mrs. Brown's will named the Northern Trust Company (hereinafter Northern Trust) as sole executor, and the Northern Trust retained the law firm of Keck, Cushman, Mahin and Cate (hereinafter attorneys) to act as its legal counsel in the settlement of the Brown estate. In its final account Northern Trust stated that the executor's commission and the attorneys' fees amounted to $33,000 and $33,800 respectively. Addison L. Elliott and Richard A. Elliott (hereinafter objectors), beneficiaries under Corra Brown's will, filed objections to this account, and Addison Elliott also petitioned the court to remove the Northern Trust as executor, claiming that Northern Trust had breached its fiduciary duty to the beneficiaries. After an evidentiary hearing, the trial court held that the requested fees were reasonable, and it dismissed the petition to remove the executor. The objectors appeal, reasserting their contentions: (1) that the fees awarded to the executor and to its attorneys were excessive; and (2) that the Northern Trust breached its fiduciary duty to Mrs. Brown's heirs.
Corra Brown died on March 23, 1970. The value of her gross estate was ascertained to be $1,614,255. Her will was admitted to probate on May 19, 1970, and letters testamentary were issued to the Northern Trust on that date.
On October 17, 1973, the Northern Trust filed its first account showing *699 partial payment of its executor's fee and the fees of its attorneys, each in the amount of $22,000. Both objectors consented to the approval of this account. The second account was filed on June 21, 1974, and once again both objectors gave their consent. However, it was alleged that the first and second accounts were submitted directly to the beneficiaries without notice to their attorney of record.
On November 17, 1975, the attorney for the objectors sent a letter to Northern Trust in which he asked the executor to itemize the services of its attorneys. On November 26 this attorney received a written notification that Northern Trust would file its final account on December 8, 1975. However, this communication did not contain an itemized list of legal services. On December 1, 1975, the objectors' attorney sent a second letter in which he requested that a representative of Northern Trust appear in his office for a deposition to discover what legal services had been rendered to the Brown estate.
The deposition of the executor's representative was taken on December 5, 1975. She testified that the fees of both the attorneys and the executor were determined by the value of the estate, and that, because of this fact, she was unable to document the amount of time expended on the estate by the attorneys.
On December 8 the Northern Trust presented its final account to the trial court. Addison Elliott and Richard Elliott then filed their objections to this account. On the same day a representative of the executor informed Addison Elliott that there could be no final distribution of the principal from the estate to the two testamentary trusts, established by Mrs. Brown's will for his benefit, until the litigation contesting the approval of Northern Trust's final account was resolved. However, this representative offered to make an immediate distribution of the income balance in Elliott's trust account. This offer was refused by Elliott. Allegedly $107,912.42 remained in Mrs. Brown's estate on December 8, 1975.
On December 30, 1975, the petition seeking the removal of the Northern Trust as executor was filed. On January 20, 1976, Northern Trust and its attorneys petitioned for additional fees for answering the beneficiaries' objections to the final account and for responding to Addison Elliott's petition to remove the executor. Northern Trust requested an additional $4,500, and its attorneys sought $6,000.
On February 23, 1976, the trial court, in response to a petition by the Northern Trust, entered an order directing the executor to distribute the income received by the estate pursuant to the terms of Corra Brown's will but to retain all principal assets of the estate as of December 8, 1975, until further order of court.
The hearing on the objections to the executor's final account *700 commenced on April 12, 1976. However, the objectors did not proffer any testimony during this hearing. They limited their presentation to the cross-examination of the executor's witnesses and to the introduction of certain exhibits into evidence. The following testimony was elicited from petitioners' witnesses:
Arlindo S. Cate, a senior partner who had been in charge of probate, estate planning and trust practice at Keck, Cushman, Mahin and Cate for the past 12 years, testified that the law firm considered the following factors in determining what legal fees to charge for the probate of an estate: (1) the responsibility which is assumed by the lawyer and the law firm "to do a good quality, thorough job"; (2) the time required and the difficulty of the questions involved; and (3) the size of the estate and sufficiency of the assets. Cate stated that he would also look to the Chicago Bar Association schedule of fees, which was in effect at the time of Mrs. Brown's death, as a guideline in estimating an appropriate fee.
In projecting attorneys' fees in 1971 for the Federal estate tax return the senior attorney testified that he took the figure of $36,285 which was in accord with the bar schedule for an estate valued at $1,614,255 and reduced it by $2500 which was previously paid to the attorneys for similar work performed in connection with Corra Brown's conservatorship estate.
This witness also asserted that there were several unusual problems connected with the probate of the Brown estate. In support of this assertion he called attention to the fact that Addison Elliott was unavailable at the time of Mrs. Brown's death because he was somewhere in Mexico; that an injunction arising out of divorce proceedings between Addison and his wife prohibited the payment of funds from the estate; that certain real estate owned by the testator had building code violations; that this condition necessitated "dispossession" of such property by the executor; and that a decision had to be made whether to value Mrs. Brown's "deep discount" United States Treasury Bonds (hereinafter "flower bonds") at market value or at par value because there was pending litigation concerning the proper method of evaluating such bonds for Illinois inheritance tax purposes.
However, on cross-examination Cate conceded that he did not recall the number of hours spent by him or the firm on the building code violations, the dispossession and transfer of possession of the real estate or on the problem concerning the valuation of the "flower bonds," but he said that the law firm kept daily time records which would reveal such information. Lastly, the witness admitted that at the time he was told that Addison Elliott was missing in Mexico, Richard Elliott provided him with a correct address where Addison was subsequently contacted; that he was uncertain whether his firm spent any time in court regarding the *701 injunction; that it was his belief that Northern Trust had dispossessed itself of the dilapidated property before the City of Chicago filed its action for building code violations; and that his law firm did not participate in any of the pending litigation concerning the issue of "flower bond" valuation.
Joseph W. Townsend, who had been associated with Keck, Cushman, Mahin and Cate for eight years, testified that he expended 550 hours on the probate of Corra Brown's estate. This attorney stated that there were numerous legal problems involved in the estate including construction of the family tree and proof of heirship. Additionally, the attorney who drafted Mrs. Brown's will was deceased, his law firm was no longer in existence, and consequently the witnesses to the will had to be located. In order to reach these individuals, Townsend went through the telephone book and called persons with a last name similar to that of the witnesses. He found one of the witnesses to the will, and this person directed him to the other two witnesses.
Petitioners' witness also referred to the injunction restraining the executor from making distributions from the estate of Addison Elliott and stated that this created problems in distributing income to the various beneficiaries under Mrs. Brown's will. According to Townsend, even if the parties to the divorce action had agreed to the terms of the injunction, as suggested by the objectors, such agreement would not have lessened the problem of administration of the estate because it would not have changed the executor's obligations and duties.
Regarding the building code violations, he stated that he monitored the proceedings until the time when the Northern Trust was dismissed as a defendant.
The witness further testified that the law firm drafted the documents necessary to obtain return of the over-deposit of Illinois inheritance taxes; that distributions of bequests to the children of the two objectors were made by depositing funds in savings accounts payable to the minors subject to further order of court; and that he reviewed the fiduciary income tax returns for the years 1970 and 1971. The 1970 return required several alternative computations before the most advantageous method, in terms of tax savings for the estate, was discovered.
On cross-examination Townsend stated that depositing funds in a minor's account, subject to further order of court, is the standard method of avoiding the opening of a minor's estate, and that withdrawals can then be made pursuant to the court's order. The witness also said that Richard Elliott furnished the law firm with an accurate address for Addison Elliott sometime after the opening conference, and he admitted that heirship was given in its entirety by Richard Elliott; that the objectors' attorney handled all the proceedings involving the building code violations; that *702 the actual draft of the Federal estate tax return was prepared by the Northern Trust and sent to the law firm for approval; that he could not recall whether he made or suggested any changes in this return after reviewing it; and that he had no legal memorandum to show for his time spent on the "flower bond" issue. Although this witness testified that he devoted over three months to the question of dispossessing the executor of a single piece of real estate, he further conceded that his total work product consisted of two one-page, preprinted legal forms, and that he did not incorporate any of his conferences concerning dispossession into a legal brief. When asked whether it was conceivable that he could have expended over 175 hours on the inheritance tax, Federal estate tax and other tax problems, Townsend indicated that the time records did not break down into a specific allocation of time for each subject considered. However, he stated that his time records did contain a notation as to the primary matters handled each day.
A third attorney associated with the Keck firm testified that she first became involved in the Brown estate in 1972; that the majority of the required work had been completed by that time; and that the estate was being kept open because of the question concerning the proper valuation of the estate's "flower bonds" for Illinois inheritance tax purposes. This witness further stated that the firm's attorneys spent 796 1/4 hours on the estate between March 25, 1970, and December 5, 1975; that this amount of time was documented in the law firm's time records kept by its bookkeeping department; and that 708 1/2 hours represented the work of four attorneys each of whom had more than 10 years experience in probate matters. The relevant time records were then introduced into evidence.
On cross-examination this witness testified that she did not know how many hours the law firm had expended on the problem regarding the withdrawal of a minor's account when the minor reached majority. However, she stated that she expended approximately five hours to research and prepare the petition to close out the same account.
Morton John Barnard, an attorney specializing in estate planning, probate and trust law, testified as an expert witness in support of the attorneys' fees. This witness was a member of the Board of Regents of the American College of Probate Counsel, a co-draftsman of the Illinois Probate Act in 1939 and in 1975 and was also a member of the Rules Committee of the Probate Court. Barnard stated that $37,500 would be a reasonable fee for the legal services performed in connection with the probate of an estate where the estate is valued in excess of $1,600,000; where the executor named in the will is a corporate fiduciary; and where the executor has retained a law firm to probate the estate. In formulating his opinion the witness stated that he considered the following factors: (1) *703 the size of the estate along with the concomitant responsibilities; (2) the amount of time that would be involved in the normal handling of an estate of this kind; and (3) the type of services that were rendered in this particular case.
On cross-examination Barnard testified that he did not base his opinion upon the number of hours allocated to a certain portion of the settlement process, but that he primarily considered the legal services required by the particular estate. He discounted the overemphasis on hours because one attorney who has a certain expertise in probate matters may take less time to do a specific job than another attorney. However, he stated that this would not entitle the attorney, who took a longer time because of lack of experience, to a larger fee. Barnard also estimated that it would normally take between 400 to 800 hours to probate Corra Brown's estate. In response to the question whether the number of hours expended on the real estate problem was reasonable and proper, this witness stated that he had no way of knowing. Finally Barnard testified that Mrs. Brown's estate required no extraordinary services and that the law firm would have been entitled to a total fee of $45,000 to $50,000 if they had also done the executor's work.
Ira D. Schultz, an attorney who estimated that he had worked on well over 1,000 estates in his professional career, also testified as an expert in support of the attorneys' fees and stated that $33,800 was a reasonable fee under these circumstances. However, he also said that a fair fee would not be less than $35,000 nor more than $37,500. Schultz based his opinion on the attorneys' time and responsibility, the expertise required and the problems that were involved in Mrs. Brown's estate.
On cross-examination he stated that if he were working on the "flower bond" question, he would study and analyze the problem to determine whether to intervene in the test case. He also said that the fact that the attorneys were waiting for a definitive decision from the Illinois courts of review did not mean that they had failed to render extraordinary services to the estate. However, the witness admitted that the law firm had not shown him any evidence of independent research on the "flower bond" issue. Schultz further testified that he considered the legal services rendered with respect to the building code violations to be extraordinary and stated that it would not make a difference, in his opinion, if the attorneys for the executor monitored, rather than participated in, the building code violation proceedings since the attorneys would have been derelict in their duty if something went wrong before the order discharging them was entered.
Lastly, the witness testified that the dispossession, the divorce injunction and the contacting of Addison Elliott in Mexico were all routine matters, and that the law firm would have been entitled to a fee of *704 $54,000 if its attorneys had done all the probate work without the Northern Trust's expertise.
Lucille Lasch, a retired vice-president in the trust department of Northern Trust who was in charge of coordinating the activities of the executor on Mrs. Brown's estate, testified in support of the executor's fees and stated that the attorneys estimated a total legal fee of $33,800 as early as 1971, and that this estimate was done in connection with the preparation of the Federal estate tax return. In her opinion this estimated legal fee was reasonable. Lasch based her opinion on the fact that she was familiar with the law firm's work on the estate. She also considered the approximate size of the estate and the fact that the attorney fees were within the bank's guideline fee schedule. However, the witness admitted that she did not inquire about the number of hours expended by the attorneys when they submitted their first statement for partial payment of fees because she did not consider the time factor important inasmuch as she was working closely with the attorneys and was aware of the services which they were providing.
She further testified that she conferred with the head of the probate division at Northern Trust to discuss the appropriate fee to be charged by the executor. She stated that they considered the responsibilities of the executor, the bank's published schedule of fees, what transpired and the size of the estate. They agreed upon a fee of $33,000, which was less than the amount specified in the bank's fee schedule for an estate the size of Mrs. Brown's. However, the witness admitted that she did not know how many hours Northern Trust personnel devoted to the administration of Corra Brown's estate.
On cross-examination Lasch also conceded that the executor had the correct address of Addison Elliott; that the "flower bond" question was applicable to a number of estates being handled by Northern Trust; that the valuation issue was being litigated by another law firm; and that the attorneys for the Northern Trust were waiting for a definitive ruling by the courts.
William J. Fanning, vice-president in charge of Northern Trust's probate division, also testified in support of the executor's fees and stated that there were extraordinary problems involved in the executor's administration of Mrs. Brown's estate. He pointed out that there were problems involved in repaying loans used to buy the "flower bonds"; that the real estate required the renegotiation of a lease and eventual dispossession by the executor; that research was required on a number of worthless securities; that the estate contained Canadian securities which necessitated the filing of Canadian tax returns; that the question of valuing the "flower bonds" caused the estate to be kept open for an unusual length *705 of time; and that there was an injunction on the payment of principal and interest arising from a divorce suit against Addison Elliott.
In determining the executor's fees Fanning stated that he considered the bank's schedule of fees, the services performed, the assets and the nature of the assets, the responsibility assumed, the complexity of duties and the results obtained. He further stated that the bank's fee schedule is published and made available to the bank's customers, and that he never has asked for an itemized list of legal services from the attorneys for an estate because the bank as executor is only concerned whether the job is done well and in a professional manner. In determining whether the fees for legal services are reasonable, he stated that the executor should consider the quality of the attorneys' work, the cooperation received from the attorneys, the attorneys' concern and the promptness with which they act. This witness estimated that 25% of Northern Trust's personnel maintain records of the time devoted to a particular estate. However, he stated that this group of employees records only 40% of the actual time that they expend on probate matters.
On cross-examination Fanning testified that he first learned of the number of hours expended by the attorneys when he read their petition for fees; that he made no investigation to check the accuracy of the stated hours; and that he could produce no evidence to support his assertion that Northern Trust personnel put in more time on a particular estate than is diaried in their time sheets.
Howard Wittenberg, vice-president in charge of the Personal Trust Services Group at American National Bank and Trust Company, testified as an expert witness in support of the executor's fees and stated that his bank considers several factors in determining fees for the bank as executor. The primary factors are problems with assets, people, investments, real estate and taxes and the length of time the estate is open. However, the most important factor is the bank's responsibility for the assets taking into account their value. This witness also stated that his bank uses a published fee schedule as a guideline for determining its fees; that bank personnel do not record the time spent on a particular estate; that his bank would not request an itemized statement from attorneys who render legal services in the probate of an estate unless their fees were greatly in excess of the guideline figure; and that a reasonable fee for Corra Brown's estate would be between $33,000 and $35,000. Wittenberg further testified that he also weighed the executor's responsibility, results and amount of risk assumed in determining the final amount he charged as a fee.
On cross-examination he stated that he could not estimate a reasonable hourly rate for an executor probating an estate comparable to Mrs. *706 Brown's since the work at his bank is not billed on an hourly basis. He indicated that each estate must be examined individually. However, he conceded that it was the duty of the executor to make certain that the attorneys' fees are reasonable and represent necessary services.
M. James Termondt, vice-president in charge of the Personal Trust Department of Continental Illinois National Bank and Trust Company, also testified as an expert witness in support of the executor's fees. He stated that a reasonable fee for Mrs. Brown's estate would range between $37,000 and $40,000.
On cross-examination Termondt said that he was unable to give an hourly rate for an executor to charge for this particular estate because an executor is concerned with the type of work required to be done and the responsibility that is involved. He agreed that it is the duty of the executor, when requested by the beneficiaries, to examine the services performed by the attorneys in order to make certain that their fees are reasonable. However, this witness stated that it is not necessarily the custom of his bank to provide the beneficiaries with an itemization of the attorneys' services when their requested fees are in excess of $33,000.
On July 1, 1976, the petitions for additional commissions and fees were withdrawn by leave of court. The trial court then approved the final account.
Objectors argue that much of the time expended by the attorneys in the probate of Corra Brown's estate was not necessary and beneficial to her heirs. Specifically, they contend that the number of hours claimed by the attorneys in their petition for fees is inflated since a large percentage of the asserted time represents work duplicated by the executor. Objectors also argue that petitioners failed to introduce competent evidence to support the fees requested by Northern Trust.
 1, 2 Executors and attorneys representing executors are entitled to reasonable compensation for their services. (Ill. Rev. Stat. 1975, ch. 3, pars. 336-337.) However, the decision as to what constitutes reasonable compensation is a matter peculiarly within the discretion of the Probate Court. (See In re Estate of Jaysas (1st Dist. 1961), 33 Ill. App.2d 287, 292, 179 N.E.2d 411, 413.) There is no clear-cut rule to aid the court in ascertaining what a reasonable fee should be. Each determination must be based on the facts and circumstances of the particular case being considered. (See Martin v. Central Trust Co. (1927), 327 Ill. 622, 637, 159 N.E. 312, 318; In re Estate of James (3d Dist. 1956), 10 Ill. App.2d 232, 239-42, 134 N.E.2d 638, 641-43.) The factors to be weighed by the trier of fact include the size of the estate, the work done and the skill with which it was performed, the time required, and the advantages gained or sought by the services rendered. Good faith, diligence and reasonable prudence should also be included so as to prevent on the one hand excessive charges *707 and, on the other hand, inadequate allowances. See In re Estate of Jaysas.
This court believes that the probate court has the requisite skill and knowledge to decide what is fair and reasonable compensation for the services of an executor and its attorneys. While the number of hours claimed to have been expended in labor for an estate is an important consideration, experience in such matters enables a probate judge to make an accurate estimate of the amount of time which certain steps in the estate settlement should properly consume. (See In re Estate of Jaysas.) In the exercise of its judicial discretion the court is not to be governed entirely by the opinion of expert witnesses as to the value of the services provided. It should exercise its independent judgment in determining the remuneration to be paid. (See In re Estate of Jaysas.) In order to alter the amount of a fee allowance, a reviewing court is required to find that the trial court's determination is manifestly or palpably erroneous. Askew v. Hudgens (1881), 99 Ill. 468, 470; In re Estate of Jaysas.
 3 Careful examination of the record in this case does not compel a conclusion that the trial court's determination was erroneous. The value of the gross estate was $1,614,255. It was established that the attorneys performed the following services in the settlement of the Brown estate: the preparation and presentation of routine papers to the probate court; the researching, drafting and presenting of certain court documents necessitated by the dispossession of decedent's real estate and by various distributions to minor beneficiaries; the monitoring of the building code violation proceedings until the executor was dismissed as a defendant; the drafting of the necessary documents to regain the over-deposit of Illinois inheritance taxes; the performance of work with regard to distribution problems created by injunctions that were issued as a result of the divorce proceedings against Addison Elliott; the examination and review of the estate's tax returns; independent research on the flower fund problem; and the location of witnesses to Mrs. Brown's will.
It was further established that Northern Trust discharged all of the routine duties made necessary by the opening of the Brown estate. Some of these include the examination of the contents of decedent's safe deposit box, the closing out of Mrs. Brown's bank and charge accounts, the listing of the estate's assets and the payment of funeral expenses. In addition to these services, the executor performed sophisticated tax planning that saved the estate several thousand dollars. It also filed Canadian tax returns, researched the estate's worthless securities, repaid the loans used to purchase the flower bonds and dealt with the problems that arose when the estate was kept open for an unusually long period of time on account of the flower bond valuation question.
The central point of contention concerns the number of hours which *708 petitioners claim to have expended on behalf of Mrs. Brown's estate. Regarding the attorneys' assertion of 796 1/4 hours, objectors state that "[t]he heirs' lawyer * * * participated in many of the subjects set forth in [the] petition [for fees] and was incredulous at the number of hours [claimed.]"
As indicated previously, the trial court need not consider the number of hours expended as the determinative factor in deciding whether a certain fee is reasonable. The problems inherent in the utilization of this standard have been described by this court in the past:
"The hourly rate procedure does not take into consideration that the greater the value of property involved, the greater the responsibility of the lawyer. It tends to reward the slower practitioner and does not recognize that a lawyer spends time even in leisure moments pondering the problems of his client." (In re Estate of Parlier (4th Dist. 1976), 40 Ill. App.3d 840, 842, 354 N.E.2d 32, 35.)
However, the trial court is entitled to examine such evidence since it has the necessary experience to correctly assess the validity of the asserted hours.
A review of the record in the instant case does not establish that the attorneys did not expend 796 1/4 hours as claimed. This figure is supported by the law firm's time records which were maintained on a regular basis during the ordinary course of business, by the numerous legal services that were provided and by the testimony of expert witness Barnard which indicated that the normal number of hours for an estate of this kind would range from 400 to 800.
Furthermore, objectors did not call the heirs' attorney as a witness; nor did they produce any other relevant evidence concerning this matter. Under these particular circumstances, objectors have failed to substantiate the contention that the attorneys attempted to justify their fees by inflating the number of hours listed on their time sheets.
During the hearing on the objections to the final account, Northern Trust introduced evidence which showed that its employees had expended 314 1/2 hours on the Brown estate. Regarding this fact, objectors point out that petitioners' expert witnesses were unable to estimate a reasonable hourly rate for an executor to charge in this type of an estate, and because of this they argue that there is no competent evidence as to the value of the executor's services. Objectors also assert that the demanded fee of $33,000 is equivalent to $105 per hour, and they argue that this rate is unreasonable because it is more than twice the amount expert witness Schultz said was a fair figure for the attorneys.
 4, 5 Professional and individual executors as well as attorneys should anticipate that fees may on occasion be conscientiously or *709 otherwise questioned and that adequate record keeping would enhance the faith and confidence of the client and public. There appears to be, however, no legal duty imposed upon an executor to reflect the number of hours spent in each activity that it has performed. (In re Estate of Edwards (2d Dist. 1942), 312 Ill. App. 645, 39 N.E.2d 72, 75.) Nevertheless, it is true that an executor's fee of $105 per hour would be unreasonable in this case. However, the evidence indicates that the executor's time records greatly understate the number of hours its employees expended on behalf of the Brown estate. This conclusion is based on the testimony of William Fanning. He stated that only 25% of Northern Trust's personnel records the time devoted to a particular estate, and that this group tabulates only 40% of the actual time spent on probate matters. Testimony reveals that more than 314 1/2 hours were devoted to Mrs. Brown's estate. Thus, the objectors have not demonstrated that the fee is patently unreasonable.
 6 In the same vein objectors argue that the attorneys duplicated many of the services performed by the executor. It is certain that a charge may not be made for duplicated work. However, objectors were unable to elicit any testimonial evidence which confirms their contention that the same services were performed by both the executor and the law firm. Consequently, this argument fails.
The attorneys' fees and the executor's commission are also supported by the testimony of the expert witnesses. Ira Schultz stated that $33,800 was a reasonable fee for the services rendered by the attorneys in the probate of this estate. However, he also said that a fair fee would not be less than $35,000 nor more than $37,500. Schultz based his opinion on the following considerations: the attorneys' time and responsibility, the expertise required and the problems involved in Mrs. Brown's estate. Morton John Barnard testified that a reasonable attorneys' fee would be $37,500. In formulating this opinion Barnard took into account the size of the Brown estate along with the concomitant responsibilities, the amount of time that would be involved in the normal handling of an estate of this kind and the type of services that were rendered in this particular case.
Regarding the executor's commission, Howard Wittenberg stated that a reasonable fee would range between $33,000 and $35,000. In determining the fee's scope Wittenberg considered Northern Trust's responsibility, the results obtained and the amount of risk assumed by the executor. M. James Termondt testified that a reasonable fee would be somewhere between $37,000 and $40,000.
Objectors assert that the opinions of the expert witnesses who testified in support of the attorneys' fees are biased because they, as probate lawyers, have a vested interest in maintaining the large fees that are customarily charged for such services.
*710 Although this contention may find some support among the populace at large and even members of the bench and bar, the trial court in exercising its discretion is not to be entirely influenced by the opinions of attorneys as to the value of the services rendered. However, the trier of fact is entitled to consider such testimony in determining whether the requested fee constitutes reasonable compensation. See In re Estate of Saperstein (1st Dist. 1974), 24 Ill. App.3d 763, 769-70, 321 N.E.2d 328, 333-34.
Objectors point out that both the executor and the attorneys used a preexisting fee schedule, which was based on a set percentage of the estate's total value, to aid them in formulating their fees. They argue that it is improper to employ such a schedule as the standard for fixing compensation.
Although it has been established that fee schedules based on the estate's value without regard to the value of the services rendered cannot be used as the sole method for determining compensation (In re Estate of Edwards (2d Dist. 1942), 312 Ill. App. 645, 650, 39 N.E.2d 72, 74), this court recently affirmed the allowance of executors' and attorneys' fees which had been computed from fee schedules that were based upon a percentage of the gross estate. (In re Estate of Parlier (4th Dist. 1976), 40 Ill. App.3d 840, 842-44, 354 N.E.2d 32, 35-36.) In Parlier the attorney for the estate used an old schedule that had been published by a local bar association. Regarding this aspect, the court stated that past issuance of a bar association fee schedule would have a direct bearing on the locality's present customary charges for the legal services provided. Since it felt that the customary charge for the same or similar services was a necessary point of reference in determining whether the requested fee was reasonable, the court held that the attorney's use of the fee schedule was permissible.
 7 Attorney Cate testified that in determining its fees the law firm considered the following factors in addition to the schedule: (1) the firm's responsibility to do a good, quality job; (2) the time expended; (3) the difficulty of the questions involved; and (4) the sufficiency of the estate's assets. It is evident from this testimony that the legal fees were based primarily on the services rendered by the attorneys and not on the bar association's percentage scale.
 8 For similar reasons we feel that the executor's use of the bank's fee schedule was not improper. William Fanning stated that Northern Trust particularly considered the services performed, the nature of the estate's assets, the responsibility assumed, the complexity of the duties and the results obtained. It is manifest, therefore, that the requested commission, like the attorneys' fee, was based principally on the services provided.
Objectors also call attention to the fact that two of petitioners' expert witnesses testified that the attorneys would have been entitled to a fee *711 somewhere between $45,000 and $54,000 if they had performed the services of the executor in addition to their own. Since the total fee requested by the executor and its attorneys amounted to $66,800, objectors argue that this testimony supports their assertion that they were overcharged.
We do not find this argument persuasive. Objectors' contention assumes that a nonprofessional executor such as an heir renders the same services to an estate as does a professional fiduciary. However, this is not generally the case. The professional executor makes expert services available in the following areas: asset collection and transfer, investments and tax planning. Because of inexperience and lack of proper training, the nonprofessional is unable to provide the estate with comparable assistance. Consequently, we do not feel that the aforementioned testimony supports objectors' claim that the requested fees were unreasonable.
Finally, objectors argue that Northern Trust breached its fiduciary duty by refusing to question the attorneys' fees, by joining with the attorneys in a petition for additional fees after the heirs filed objections to the final account and by refusing two written requests for itemization of the attorneys' services.
An executor is a fiduciary and as such it owes a duty of good faith toward the estate and the beneficiaries under the will. (Edwards v. Lane (1928), 331 Ill. 442, 451, 163 N.E. 460, 463.) It is also the duty of an executor to act in the best interests of the estate. In re Application of County Collector (4th Dist. 1966), 72 Ill. App.2d 272, 276, 218 N.E.2d 244, 246.
 9 Based on our review of the record we do not conclude that the executor was substantially deficient in discharging its fiduciary duties. Lucille Lasch, the trust officer in charge of the Brown estate, testified that she worked closely with the attorneys in this matter and that because of this relationship she knew exactly what services they were providing. She stated that she did not question the attorneys regarding their requested fees because she felt that the fees were appropriate for the services rendered. Since Lasch was in close contact with the attorneys throughout the settlement of this estate, it is our opinion that the executor's failure to make direct inquiry concerning the attorneys' fees does not amount to a breach of duty.
The withdrawal by Northern Trust and its attorneys of their petition for additional fees for work expended in responding to objectors' objections to the final account and their petition to remove the executor makes unnecessary our determination of the propriety of such petitions.
We note but do not consider objectors' other arguments which we find not to be persuasive.
*712 For the reasons enumerated above, the trial court's approval of the fees requested by the petitioners is affirmed as is the court's dismissal of the petition to remove the executor.
Affirmed.
STAMOS, P.J., and DOWNING, J., concur.