*In re* ESTATE OF GEORGE S. HALAS, JR., Deceased (Kirkland & Ellis, Petitioner-Appellant and Cross-Appellee, v. Christine D. Halas *et al.,* Respondents-Appellees and Cross-Appellants).

First District (3rd Division)   Nos. 85—2422, 86—3397 cons.

Opinion filed July 22, 1987.—Rehearing denied September 14, 1987.

Lee A. Freeman, Jr., of Freeman, Freeman & Salzman, of Chicago, for appellant.

Marshall E. Eisenberg and Martin H. Tish, both of Neal, Gerber & Eisenberg, Richard L. Mandel, of Mandel, Lipton & Stevenson, Ltd., Francis J. Higgins, Robert L. Wiesenthal, and Anne S. Reams, all of Bell, Boyd & Lloyd, and William J. Harte, Ltd., all of Chicago, for appellees.

PRESIDING JUSTICE McNAMARA delivered the opinion of the court:

Petitioner, the law firm of Kirkland and Ellis, sought $957,099.05 in attorney fees and $24,359.08 in costs for its representation of the executor and trustee for the estate of decedent George S. Halas, Jr.

Objections to the petition were filed by respondents A. Gerson Miller, as successor executor of decedent's estate; Christine D. and Stephen G. Halas, decedent's minor children and beneficiaries under decedent's testamentary trusts; and Therese M. Halas, decedent's former spouse, as both an individual and as former guardian of the estates of her children, Christine and Stephen. The trial court found that a reasonable fee for petitioner was $535,000, plus the full amount of costs. Petitioner appeals from that order. Respondents cross-appeal, contending that the court should have denied petitioner all attorney fees and should have imposed a surcharge for costs incurred in defending against the petition. Respondents also appeal from the denial of Christine's request, concurred in by the guardian *ad litem* acting for Stephen and by Miller, seeking costs and attorney fees incurred in objecting to the attorney fee petition.

In December 1979, decedent died, leaving his wife of 15 months, Patricia N. Halas, and two minor children, Christine and Stephen, from a previous marriage to Therese. The estate was initially valued at $4.2 million, and is currently valued at over $10 million. The estate's principal asset is 30.5 shares, or approximately 20%, of the Chicago Bears Football Club, Inc. The stock was valued for Federal estate tax purposes at $2.4 million and has since increased considerably in value.

Under decedent's will, Patricia received one-third of the residuary estate, along with the residence and certain mineral interests. Therese received nothing under the will, but the balance of her alimony was to be paid out of an insurance trust. Under the will, Christine and Stephen, who were 14 and 12 at the time of their father's death, received two equal trusts consisting of Bears stock and two-thirds of the residuary estate. The residuary estate would include the balance of the insurance trust after their mother's alimony had been paid.

The will named George S. Halas, Sr., as the executor and trustee of the children's testamentary trusts. In the event that he could no longer act in that capacity, decedent's sister, Virginia Halas McCaskey, and a friend, A. Gerson Miller, would act as co-executors and co-trustees.

In January 1980, the will was admitted to probate and Halas, Sr., was appointed executor. Petitioner acted as attorney for the executor and successor executor until its removal as legal counsel on May 22, 1984.

Therese Halas filed various claims in the probate division, totalling $1.267 million, against the estate. These claims remain unre-

solved. Therese also filed several actions in the circuit court, totalling $1.3 million, in relation to her divorce agreement and child support. Petitioner represented the executor, Halas, Sr., in his defense against these actions on behalf of the estate. Petitioner was successful in almost all respects. The trial court dismissed the three domestic relations actions. This court reversed and remanded to allow amendment of the section 72 petition, but otherwise affirmed dismissal of the two petitions. (*Halas v. Executor of Estate of George S. Halas, Jr.* (1983) 112 Ill. App. 3d 940, 445 N.E.2d 1264.) In 1984, the supreme court affirmed that decision. *In re Support of Christine Halas* (1984), 104 Ill. 2d 83, 470 N.E.2d 960.

In early 1980, petitioner began work on the corporate reorganization of the Bears. The organization was completed on December 17, 1981. Originally, the Bears Football Club, Inc., which was incorporated in Illinois, had a single class of common stock without preference. The reorganized corporation, which was incorporated in Delaware, had four classes of common stock. In exchange for its 30.5 shares of Bears stock in the Illinois corporation, the estate received 183 shares of class C Bears stock in the Delaware corporation. The new shares were subordinate with respect to dividend and liquidation rights to classes A and B stock. In addition, the various stockholders transferred their new Bears stock to various personal holding companies.

Unlike the Bears' Illinois stock, the new stock is subject to a right of first refusal and cannot be pledged without the Bears' consent. In addition, the cumulative voting rights were eliminated and consequently the estate can no longer elect a member to the board of directors. The subchapter S tax status of the Illinois corporation was terminated.

In connection with the reorganization, petitioner represented the interests of the Bears; Halas, Sr., individually and as chief executive officer of the Bears; Virginia McCaskey, her husband and her children, some of whom were directors and officers of the Bears; and the estate.

On October 13, 1981, the probate division entered an order requiring the estate's executor to give 30 days' advance written notice to Thomas S. Chuhak, the guardian *ad litem* for Christine and Stephen, of any decision to convey the shares of stock issued by Bears. The guardian received no notice of the reorganization. In December 1981, petitioner met with the McCaskey family and explained the reorganization plans in detail. The reorganization was not disclosed in the executor's first current account filed August 23, 1982, amended supplemental first current account filed September 3, 1982, or restated first

current account filed October 19, 1982.

On November 5, 1982, the guardian *ad litem* wrote to petitioner asking about voting restrictions or other limitations affecting the value of the stock. Petitioner responded that the 30.5 shares were still assets of the estate and that there were no restrictions affecting value. In April 1983, because of unsatisfactory responses to requests for various documents, the guardian began formal discovery procedures.

On April 26, 1983, without the knowledge or permission of co-trustee Miller, petitioner caused the court to enter an "agreed" order stating that Miller temporarily delegated his rights and powers as co-trustee. When petitioner later asked Miller to delegate his duties and powers, Miller refused. Petitioner then had the order withdrawn.

In May 1983, the reorganization of the Bears, which was completed in December 1981, was disclosed in the executor's second current account filed by petitioner. On October 31, 1983, Halas, Sr., died, and on November 14, 1983, McCaskey and Miller were appointed successor co-executors. Petitioner continued to represent McCaskey in her new capacity. Miller retained separate counsel.

On December 30, 1983, petitioner caused the estate accounts to pay it $285,178.83 in fees and expenses without the knowledge or consent of the co-executors. At the time, petitioner acted as legal counsel for the estates of both decedent and Halas, Sr., for the Bears, and for decedent's holding company. Petitioner arranged for the Bears to loan $500,000 to the holding company; the holding company to loan the money to the estate; and the estate to pay petitioner's fees. In response to repeated requests, petitioner gave Miller computerized billing printouts, but did not notify him that the 1983 fees had already been paid. In April 1984, a review of the estate and trust tax reports revealed a deduction for attorney fees.

In May 1984, petitioner was removed as attorney for the estate and was asked to transfer the estate files to the executors' attorneys. The delivery was made in August 1984. Petitioner delivered unmarked files from which all memoranda and notes had been removed. The memoranda were turned over in December 1984. On September 11, 1984, petitioner filed its petition for attorney fees in the amount of $957,099.05. The petition was supported by a memorandum and affidavit of William L. Rowder, one of petitioner's principal attorneys working on the estate. The memorandum described the complexity of the estate; the services rendered; the final benefits to the estate; and the extraordinary time and nature of services required to defend the estate against litigation brought by Therese.

On September 14, 1984, McCaskey resigned as co-executor, and Miller became the sole executor. On March 13, 1985, petitioner repaid the fees which it had paid to itself from the estate funds in December 1983.

On January 7, 1985, the hearing on the fee petition began. Witnesses testifying for petitioner included six attorneys whose time accounted for over 85% of the total time billed to the estate. Those witnesses outlined their work for the estate, the method of recording their time, and the financial benefits to the estate resulting from their services.

Roy M. Adams, an attorney practicing probate law in Chicago, testified as an expert for petitioner. Adams opined that a reasonable fee would be between $750,000 and $1,200,000. James N. Zartman, a probate attorney, also testified for petitioner as an expert. Adams and Zartman testified that the estate involved novel and complex issues; that Therese's litigation and intrusions created substantial difficulties; that the estate benefited from petitioner's legal services; that the time expended was necessary; and that the fees requested were reasonable.

Edward McCaskey, chief executive officer of the Bears, testified for respondents that he did not authorize the December 1983 payment of fees to petitioner. Ted Phillips, comptroller for the Bears, testified for respondents regarding the method in which petitioner had its fees paid in December 1983. Miller testified for respondents regarding his efforts to recover the fees paid in December 1983. Therese, Christine and Stephen testified regarding their relations with petitioner.

Donald A. Gillies, a probate attorney, testified for respondents that a reasonable fee for petitioner would be between $550,000 and $600,000. He found that petitioner's overstaffing resulted in the delegation of assignments to inexperienced attorneys, too many conferences, and the duplication of work. Disclosure of the reorganization should have been made, particularly since the McCaskey family was informed of the reorganization two weeks prior to its implementation. Gillies opined that the "agreed" order delegating Miller's powers without his consent and the unauthorized fee payments in December 1983 were inappropriate.

On July 16, 1985, the trial court allowed petitioner costs of $24,359.08, but reduced the attorney fees to $535,000. The court also ordered petitioner to pay interest to the estate on the fees and expenses which petitioner had paid itself in December 1983. The court denied Christine's petition, which was joined in by Miller and the guardian *ad litem* acting for Stephen, for costs, expenses and attor-

ney fees incurred as a result of filing objections to petitioner's request for attorney fees from the estate.

Petitioner first argues that as a matter of law the trial court erred in finding that an attorney-client relationship existed between petitioner and the trust beneficiaries, Christine and Stephen. The trial court neither expressly made such a finding nor implied the existence of such a relationship. Consequently, we will not address the issue further.

■ Petitioner contends that the trial court erred in finding that petitioner breached a fiduciary duty to the estate's beneficiaries, Christine and Stephen. The trial court found that petitioner's fiduciary duty to the beneficiaries derived from the executor's duty. At oral arguments before this court, petitioner conceded that such a fiduciary relationship existed between petitioner and the beneficiaries. (See *In re Estate of Knoes* (1983), 114 Ill. App. 3d 257, 448 N.E.2d 935 (court held that executor's attorney must be solicitous of the beneficiaries' interests); *In re Estate of Minsky* (1978), 59 Ill. App. 3d 974, 376 N.E.2d 647 (court found that executor's attorney must act in the interest of and to benefit the estate); *In re Estate of Larson* (1985), 103 Wash. 2d 517, 694 P.2d 1051 (fiduciary duties of attorney for personal representative run not only to personal representative but also to heirs); *Riggs National Bank v. Zimmer* (Del. Ch. 1976), 355 A.2d 709 (attorney for trustees owes fiduciary obligations to beneficiaries of trust).) The attorney for the executor, therefore, must act with due care and protect the interests of the beneficiaries.

■ Petitioner argues further that the trial court could not find a breach of petitioner's fiduciary duty to the beneficiaries, absent a finding that the executor breached his duty to manage the estate's assets prudently and in the manner directed by the will. We find, however, that petitioner breached its derivative fiduciary duty as a result of its conduct in the reorganization of the Bears, and also breached its own separate fiduciary duty to the beneficiaries. See, *e.g., In re Clarke's Estate* (1962), 12 N.Y.2d 183, 188 N.E.2d 128, 237 N.Y.S.2d 694 (court held that estate attorney breached his duty, notwithstanding the fact that the executor's actions were proper).

Petitioner contends that even if the executor had breached his duty, such a breach would not be attributable to petitioner where it did nothing independently or in bad faith. For example, petitioner repeatedly emphasizes that its conduct cannot be viewed as improper because it merely carried out the wishes of the executor. Such an assertion ignores Rowder's testimony that petitioner advised Halas, Sr.,

that it was not necessary to inform the beneficiaries prior to the reorganization. In addition, the record supports a finding that petitioner acted in bad faith as to both its derivative and independent fiduciary duties.

One indication of petitioner's bad faith is its conduct concerning the reorganization of the Bears. Petitioner violated a court order and breached its own fiduciary duty to the estate as a result of both its failure to notify respondents or the guardian *ad litem* of the reorganization and its failure to protect respondent's interests in the reorganization.

On October 13, 1981, the probate division ordered that notice must be sent to the guardian *ad litem* acting for Stephen and Christine of any decision "to sell, convey, mortgage, encumber, hypothecate, or effect a redemption of any of the shares of stock issued by Chicago Bears Club, Inc., that have been, or effect a redemption of any of the shares of stock issued by Chicago Bears Club, Inc., that have been, or are hereafter, inventoried by the Executor of this Estate." In December 1981, however, petitioner implemented a reorganization plan which involved dissolving an Illinois corporation and incorporating the club as a Delaware corporation. The guardian *ad litem* was not notified.

On December 17, 1981, only two months after the court entered its order requiring notice to the guardian, Cass, one of petitioner's principal attorneys both on the estate and the Bears reorganization, misrepresented the status of the stock to the guardian. Cass had written in a memorandum entitled "Recapitalization of Chicago Bears Football Club, Inc." that 30.5 shares of old Bears common stock were exchanged for 183 shares of class C common stock of the new Bears. The exchange agreement drafted by petitioner and other reorganization documents referred to the "conveyance" and transfer of the shares. In sharp contrast to these descriptions, in November 1982, Cass wrote to the guardian *ad litem* that the 30.5 shares "which were owned by the decedent at the time of his death *** are still held as assets of the estate."

The trial court was entitled to find that petitioner viewed the reorganization as an exchange or transfer of stock, and thus violated the court order by not notifying the guardian *ad litem*. In addition to violating the court order, petitioner showed bad faith in not telling the beneficiaries of the reorganization plan. Explanations were offered to the McCaskey family, but not to the beneficiaries of the trust which included the Bears stock. Furthermore, petitioner expressly advised Halas, Sr., not to notify the guardian of the reorganization.

The timing of the reorganization and the filing of the executor's account also indicted bad faith. Rowder testified that petitioner advised Halas, Sr., that it was "not necessary to inform [the beneficiaries] prior to the transaction occurring, but that rather as executor, he had a duty to inform them by way of an account which he subsequently filed listing the transaction." Petitioner, however, delayed the performance of that duty to inform by filing the first account only one day before the reorganization was implemented and by postponing the filing of the second account for an additional 17 months. The first account reported activities through December 16, 1981. Petitioner finalized the reorganization on December 17, 1981. The second current account, disclosing the reorganization, was not filed by petitioner until May 16, 1983.

Additionally, petitioner's conduct showed an absence of good faith in failing to represent the beneficiaries' interests in connection with the reorganization. For example, the new stock was subject to a right of first refusal. Gillies testified this would have a chilling effect on the estate's ability to obtain offers for its shares. The vote of only one league member could veto a transfer. In contrast, the prior restriction imposed by the National Football League required a vote of more than one-quarter of the member teams to veto a transfer. Moreover, the cumulative voting rights were eliminated and consequently the estate can no longer elect a director to the board. Thus, the estate's unrestricted common stock was exchanged for restricted and subordinated class C stock and then transferred to the Halas, Jr., holding company in exchange for all the holding company's stock. There was credible testimony, then, that the corporate reorganization altered the voting, dividend and liquidation rights of the new shares, statutory protections, tax consequences, and possibly other rights and liabilities.

Petitioner argues that the stock was not redeemed, and therefore the transaction did not fall under the court order. This is too narrow a reading of the order, which related to any type of conveyance and which did not require a redemption.

Petitioner also contends that the reorganization could not indicate bad faith because it ultimately benefited the estate. As stated, the elimination of cumulative voting rights and the creation of a right of first refusal in the Bears were not necessarily benefits to the estate or to the beneficiaries. (See *Norris v. Estate of Norris* (1986), 143 Ill. App. 3d 741, 493 N.E.2d 121.) Furthermore, in determining whether petitioner's conduct evidenced an absence of good faith, the focus is not on the substantive details of the reorganization. Instead, the focus centers on petitioner's conduct in violating the court order, *e.g.*, in no-

tifying Halas, Sr., and the McCaskeys of the reorganization, but not notifying Miller, the beneficiaries, or the guardian *ad litem*.

An additional indication of the absence of good faith concerned fees paid to petitioner by the estate. On December 30, 1983, petitioner paid itself fees and costs of $285,178.83 from the estate funds, but without the approval of the executors or trustees. The Bears, whom petitioner also represented, loaned $500,000 to decedent's holding company, which petitioner had organized as part of the club's reorganization plan. Petitioner then had the holding company loan the money to decedent's estate, and petitioner deposited the funds into the estate account. Finally, petitioner paid itself the fee from the estate account. At that time, the bank had no signatures on file for the successor co-executors. On the authorization of the Bears' comptroller, however, the bank issued the money to petitioner. Miller repeatedly requested fee information from petitioner. Petitioner provided computerized billing printouts, but did not notify Miller that the 1983 fees had been paid. The payment was not revealed until four months later, when the estate income tax return showed the payment of the attorney fees. In October 1984, Miller filed an action, demanding return of the fees. In March 1985, after Miller had filed a motion for summary judgment and the court had indicated it would order a full refund, petitioner agreed to return the fees and costs.

Yet another example of conduct tending to show petitioner's bad faith occurred when petitioner delayed the transfer of the relevant files to the attorney for the successor co-executor after petitioner was removed as attorney for the estate. When the files were relinquished, petitioner had removed all identification labels and all handwritten and typewritten legal memoranda, despite the fact that the estate had been charged for the memoranda.

An additional indication of petitioner's bad faith is its action in having the court enter an "agreed" order which made Virginia McCaskey the sole acting trustee. Without Miller's knowledge or permission, his powers were "temporarily delegated" to McCaskey. Petitioner now describes this conduct as "inconsequential." We cannot agree.

Petitioner places considerable emphasis on the issue of whether it improperly represented multiple parties in light of potential conflicts of interest. Petitioner argues that the trial court erroneously found that the multiple representation was evidence of the absence of good faith and thus a breach of the fiduciary duty which petitioner owed to the beneficiaries. Petitioner depicts this finding as the "lynchpin" of the trial court's decision; as "legal misconceptions which skewed the

lower court's approach"; as "a red herring"; and as an error which "infects the lower court's entire analysis."

We disagree with petitioner's characterization of the trial court's analysis. Whether the multiple representation was improper was merely one example set forth by the trial court as evidence of the absence of good faith. Moreover, petitioner's own expert witness, Adams, testified that in the circumstances of this case, general representation of the estate should only be undertaken with full disclosure and that full disclosure of the reorganization should have been made. An attorney cannot represent conflicting interests in the same matter. (See generally 4 Ill. L. & Prac. *Attorney & Counselors* sec. 43 (1971).) The rule does not apply where the interests are only nominally conflicting or where no actual conflict exists. (*In re Estate of Kapraun* (1959), 21 Ill. App. 2d 231, 157 N.E.2d 700.) During the years in which petitioner represented the estate, it also represented clients whose interests could conflict with the interests of the estate or its beneficiaries. Petitioner represented Halas, Sr., as executor of the estate, trustee of the testamentary trusts, trustee of the 1978 trust, chief executive officer of the Bears, and individually. In handling the reorganization and the valuation of the Bears stock, the interests of Halas, Sr., and the estate or beneficiaries could have conflicted.

For example, the reorganization permitted Halas, Sr., to "freeze" the value of his estate for tax purposes. Adams testified that this did not benefit decedent or his estate. However, Halas, Sr., and the beneficiaries of his estate benefited from the freeze. These beneficiaries included 13 grandchildren, 11 of whom are the children of Virginia McCaskey and who take 11/13 of the Halas, Sr., estate. Moreover, it may have been advantageous for Halas, Sr., as a majority owner, and the McCaskey family members who received salaries from the Bears, to preserve family ownership of the Bears. This, however, may not have been in the best interests of the trust beneficiaries as minority nonemployee shareholders.

Petitioner also represented the Bears, which the evidence indicated might have conflicted with the interests of the estate and its beneficiaries. For example, as a result of the elimination of cumulative voting, the estate and its beneficiaries lost the right to elect a director to the Bears' board. In addition, subchapter S tax status of the Bears was beneficial to the estate, but this status was lost due to the reorganization. Petitioner also represented Virginia McCaskey, her husband and her children in connection with the reorganization. The reorganization permitted Virginia to "freeze" her estate.

A further indication of the conflicting interests of petitioner's cli-

ents involved what the parties refer to as the "squeeze out" memorandum. The memorandum discussed a Delaware corporation which was a professional sports team with four classes of stock and analyzed the obligations of directors to minority shareholders in a compulsory sale of their shares to the corporation. While the estate was not billed for the preparation of this memorandum, Cass charged the estate for the time he spent reviewing the memorandum. While petitioner asserts that the memorandum applied to nonfamily shareholders, it can be inferred that the memorandum reflected the position of directors of the Bears, now a Delaware corporation, to minority shareholders, i.e., Christine and Stephen. Zartman testified that it was possible the purpose of the memorandum was to eliminate the interest of the estate. In view of the other testimony, however, the trial court was entitled to find that the memorandum evidenced a conflict of interest due to petitioner's representation of Halas, Sr., and the McCaskey family, who were majority shareholders, directors and officers of the Bears, and the estate's trust beneficiaries, who were minority shareholders.

Furthermore, in seeking to discover the assets of decedent contained in his estate, several notices and subpoenas for depositions and production of documents were filed. In seeking to have these subpoenas quashed, petitioner represented the Bears, McCaskey, Northern Trust Company, and American National Bank and Trust Company, against the estate.

There was also extensive testimony from expert witnesses for all the parties regarding the benefits or disadvantages to the estate as a result of petitioner's legal services. Without repeating this lengthy testimony, we find that there was a sufficient basis for the trial court to conclude that petitioner failed to protect the best interests of the beneficiaries. For example, Stephen points to the fact that petitioner charged over $500,000 in fees for "fighting Christine and Stephen in the divorce litigation, in child's award requests and in budget hearings." Stephen highlights petitioner's January 1981 internal memorandum stating that "the tax consequences to the estate are none of Terry's or Harte's business." In addition, an unsigned memorandum suggested that the disadvantage of following the otherwise advantageous tax plan for the children would be loss of control of the funds.

Stephen also points to a July 1980 internal memorandum of petitioner which refers to the need to keep the child support awards small. "No cases have been found to counter the children's likely argument that the larger than average size of the estate justifies an award above the minimum." The same memorandum concludes that "any argument that the children should not be granted an award be-

cause they have adequate support from independent income is likely to be rejected." Additionally, a letter dated December 2, 1980, from petitioner to Jerome Vanissi, treasurer of the Bears, requests permission to give Therese, as Stephen's guardian, information about certain custodial and bond accounts for which decedent was the custodian for the benefit of the children. Finally, Stephen notes that while an attorney for petitioner recommended to Rowder in March 1980 that a guardian *ad litem* be appointed for Stephen and Christine, no guardian was appointed until August 1980. We conclude that finding that petitioner did not act in good faith was supported by the evidence.

■■■ Respondents contend in their cross-appeal that, as a matter of law, a finding of petitioner's bad faith and representation of conflicting interests mandates a denial of all attorney fees to petitioner. It has been stated as a general principle that attorneys may not recover fees after representing adverse, conflicting, and antagonistic interests in the same litigation. (*De Korwin v. First National Bank* (N.D. Ill. 1957), 155 F. Supp. 302; see also *In re Estate of Lindberg* (1981), 98 Ill. App. 3d 212, 424 N.E.2d 1161 (general rule applied to executors); see generally 4 Ill. L. & Prac. *Attorneys & Counselors* sec. 124, at 213 (1971).) However, the determination as to whether fees should be disallowed is a matter peculiarly within the discretion of the probate court. (*In re Estate of Klappa* (1958), 18 Ill. App. 2d 501, 152 N.E.2d 754.) The findings and judgment of the trial court will not be disturbed if there is any evidence in the record to support the findings. (*In re Estate of Freund* (1978), 63 Ill. App. 3d 1, 379 N.E.2d 935.) In the present case, the evidence supports the trial court order refusing to deny all attorney fees. Many benefits were derived by the estate as a result of petitioner's legal services. (See *Leader v. Cullerton* (1976), 62 Ill. 2d 483, 343 N.E.2d 897.) Much of petitioner's work was carried out solely for the benefit of the estate. (See *In re Estate of Minsky* (1978), 59 Ill. App. 3d 974, 376 N.E.2d 647.) We conclude that petitioner is entitled to the fair and reasonable value of the legal services rendered. (See *De Korwin v. First National Bank* (N.D. Ill. 1957), 155 F. Supp. 302; *Beerly v. Wm. Meyer Co.* (1947), 332 Ill. App. 653, 75 N.E.2d 783 (abstract).) After reducing petitioner's request, the trial court did not abuse its discretion in awarding fees to petitioner.

■■ ■ Petitioner contends, however, that the trial court erred in finding that its fees were excessive and in substantially reducing the fees. Attorneys representing executors are entitled to reasonable compensation for their services. (Ill. Rev. Stat. 1983, ch. 110½, par. 27—2.) The determination as to what constitutes reasonable compensation

is a matter peculiarly within the discretion of the probate court. (*In re Estate of Jaysas* (1961), 33 Ill. App. 2d 287, 179 N.E.2d 411.) The probate court possesses the requisite skill, expertise and knowledge to examine the testimony and the evidence in view of the relevant factors, and to reach a conclusion as to what is fair and reasonable compensation. (*In re Estate of Brown* (1978), 58 Ill. App. 3d 697, 374 N.E.2d 699.) A reviewing court, therefore, will not alter the amount set by the trial court absent manifest or palpable error. *In re Estate of Brown* (1978), 58 Ill. App. 3d 697, 374 N.E.2d 699; *In re Estate of Jaysas* (1961), 33 Ill. App. 2d 287, 197 N.E.2d 411.

■ Factors which may be considered in determining the reasonableness of fees include good faith, diligence and reasonable prudence used by the attorneys; time expended; the size of the estate; the work which was done; the skills and qualifications of counsel; the novelty and complexity of the issues confronted; and the benefits conferred on the client by the legal services rendered. *In re Estate of Brown* (1978), 58 Ill. App. 3d 697, 374 N.E.2d 699.

The evidence established that petitioner's fees were excessive due to the bad-faith conduct discussed above, and due to the inefficient administration of the estate. For example, petitioner had 77 people working on the estate. Of the 41 attorneys involved, seven of them billed the estate for 80% of the total time charged. The trial court properly found from the record that the large number of people involved resulted in duplication of effort, over-conferencing, and extra review time of the work done by other individuals. See *United States v. Allen* (W.D. Wis. 1982), 578 F. Supp 468.

■ Furthermore, the trial court correctly noted that inexperienced associates had been assigned research problems which should be within the general knowledge of experienced practitioners and which did not involve complex or novel matters. We cannot say that the trial court, which is uniquely qualified to assess this type of evidence, erred in finding that the estate should not be required to pay fees to educate attorneys who are paid at substantial rates, especially in this estate where the fees and expenses will come out of the shares in trust set aside for the benefit of the children. The trial court was entitled to find that petitioner billed the estate for general research work which should not have been necessary, for attorneys' time which was not required, and for work which unskilled attorneys should not have been performing. See *In re Estate of Enos* (1979), 69 Ill. App. 3d 129, 386 N.E.2d 1147; *In re Estate of Larson* (1985), 103 Wash. 2d 517, 694 P.2d 1051.

■ Further evidence of petitioner's inefficient administration

and unsubstantiated charges to the estate was revealed by the trial court's review of the billing record of the 77 people who worked on the estate and consideration of the testimony presented at trial. Many record entries showed that "several conferences" were held, without further detail regarding the identification of persons attending, topics discussed, or conclusions reached. The failure to keep proper records can greatly increase the difficulty in determining proper fees. (*Leader v. Cullerton* (1976), 62 Ill. 2d 483, 343 N.E.2d 897.) This court has previously noted that adequate record keeping would enhance the faith and confidence of the client and the public. (*In re Estate of Brown* (1978), 58 Ill. App. 3d 697, 374 N.E.2d 699.) In finding petitioner's work to be inefficient, the trial court was entitled to rely upon the absence of sufficiently detailed descriptions in the time records. For example, one attorney who billed 603 hours consistently wrote nothing more than "work on estate" in her records. While more detailed explanations were provided later and were considered by the court, we agree that such explanations are not entitled to as much weight as contemporaneous records.

The trial court also noted that petitioner unnecessarily duplicated efforts when it sent two, three, or even four attorneys to routine court appearances when often a senior litigation attorney could have handled the appearance alone or with one co-counsel. This type of practice is highly inefficient and results in excessive charges to the client. See *Leader v. Cullerton* (1976), 62 Ill. 2d 483, 343 N.E.2d 897; *In re Estate of Brown* (1978), 58 Ill. App. 3d 697, 374 N.E.2d 699.

Based on the record presented here, we cannot say that the trial court's determination as to a reasonable amount of attorney fees is palpably erroneous. The trial court carefully reviewed the extensive evidence and offered a well-reasoned opinion to support its decision. The trial court heard the testimony and reviewed all the evidence. The evidence supports the trial court's decision that the fees requested were excessive, and we believe that the court's decision to reduce the requested fees is proper.

Petitioner also requests attorney fees for defending the petition in the trial court. Time spent preparing or litigating the fee petition does not benefit the estate and will not be allowed. See *Leader v. Cullerton* (1976), 62 Ill. 2d 483, 343 N.E.2d 897; see also *Snizaski v. Heckler* (W.D. Pa. 1985, 610 F. Supp. 529, *aff'd* (3d Cir. 1986), 782 F.2d 1031; *In re Estate of Larson* (1985), 103 Wash. 2d 517, 694 P.2d 1051.

Christine contends that the trial court erred in dismissing her petition, which was joined in by Miller and by Stephen's guardian *ad*

*litem*, for costs, expenses and attorney fees incurred as the result of petitioner's conduct. She maintains that the trial court incorrectly treated the request as a section 2—611 petition. (Ill. Rev. Stat. 1983, ch. 110, par. 2—611.) She argues that the petition was, "in effect, a petition for surcharge" and an element of punitive damages. Christine also contends that the trial court erred in declining to rule on the extent of damage suffered by the estate and its beneficiaries as a result of petitioner's conduct. She maintains that the case should be remanded for a determination of the amount of actual and punitive damages. Respondents fail to cite any persuasive authority requiring the court to award fees to the objectors. The trial court did not abuse its discretion in denying this request. (*Cf. In re Estate of Larson* (1985), 103 Wash. 2d 517, 694 P.2d 1051 (where statute provides for objectors' attorney fees).) Christine's reliance on *Glass v. Burkett* (1978), 64 Ill. App. 3d 676, 381 N.E.2d 821, is misplaced. In *Glass*, the attorney clearly acted with malice. No such proof was presented in this case.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

WHITE and FREEMAN, JJ., concur.