2020 IL App (1st) 180419-U

THIRD DIVISION
December 30, 2020

No. 1-18-0419

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| *In re* ESTATE OF LISA R. LOESSY, | ) | Appeal from the |
| | ) | Circuit Court of |
| Deceased | ) | Cook County. |
| | ) | |
| (Alan E. Sohn, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | No. 12 P 4656 |
| | ) | |
| John R. Loessy, Independent Administrator With Will | ) | |
| Annexed of the Estate of Lisa R. Loessy, Deceased, and | ) | |
| Paul S. Franciszkowicz, Guardian *ad Litem* for Alec | ) | |
| Loessy, a minor Heir/legatee, and former Guardian *ad* | ) | |
| *Litem* for Paige Loessy, now-adult heir/legatee, | ) | Honorable |
| | ) | Susan Coleman, |
| Appellees.) | ) | Judge Presiding. |

_____

JUSTICE McBRIDE delivered the judgment of the court.
Presiding Justice Howse and Justice Ellis concurred in the judgment.

**ORDER**

¶ 1    *Held*: The probate court's order awarding the attorney for the executor only a portion of his requested fees was neither manifestly erroneous nor an abuse of discretion.

¶ 2    This appeal arises from a decedent's estate proceeding under the Illinois Probate Act of

1975 (Act). The Appellant, Alan E. Sohn, was retained as the attorney for the estate. After a four-

day trial on Sohn's amended fee petition, the probate court found reasonable and necessary fees in the amount of $135,000, and that the remaining $185,000 in fees requested by Sohn were unreasonable and not necessary. The probate court further ordered Sohn to repay that amount to the estate, because those fees had already been paid by the estate. Sohn's motion to reconsider that order was denied. In this court, Sohn challenges that judgment, arguing that the probate court's findings were manifestly erroneous and that it abused its discretion in failing to award him the full amount of his requested fees and in denying his motion to reconsider.

¶ 3 The record shows that decedent, Lisa R. Loessy, died unmarried on June 28, 2012, leaving a will naming her two minor children as beneficiaries and residuary legatees. Approximately one year prior to her death, a dissolution judgment was entered between decedent and her former husband, John. In the subsequent days, decedent filed a motion to vacate the judgment following her cancer diagnosis. Approximately one week before the decedent's death, decedent withdrew the motion to vacate the judgment.

¶ 4 On August 30, 2012, decedent's last will and testament was admitted to probate, and the probate court entered an order declaring the decedent's two minor children to be the decedent's heirs. The probate court appointed decedent's sister's husband, Randy Sly, as independent executor of the estate. Sohn was retained as the attorney for Sly in his capacity as executor.

¶ 5 On petition of John, as parent and custodian of the minor children, the court entered an order converting the estate from independent administration to supervised administration on September 13, 2012. That order also granted leave to the executor to represent the estate in the pending domestic relations proceedings. Thereafter, proceedings continued in the domestic relations court regarding obligations of decedent and John under their dissolution judgment.

¶ 6     On April 14, 2015, and thereafter on July 27, 2015, John, as parent of the two minor children, filed petitions raising concerns about the payment of attorney fees to Sohn by the estate. As of the later filing, John stated that Sohn had admitted to being paid approximately $223,000 from the estate. John alleged, however, that any payments to Sohn were improper because the proceeding was a supervised administration, and the court had not approved such payments.  John asked that the court require the executor to provide an accounting of his acts and activities, and that the executor cease making payments without court approval.

¶ 7     On September 1, 2015, the court ordered the executor to file a current accounting, which he did on October 27, 2015.

¶ 8     On February 10, 2016, John filed a motion for the appointment of a Guardian *ad Litem* (GAL) to represent the interests of the minor children. Among other things, John asserted that the accounting filed by the executor indicated that fees and costs had been paid to Sohn in the amount of $273,398.69, and that the payments continued to be made without court approval and without Sohn filing a petition for attorney fees. John alleged that those fees represented over 30% of the estate's assets and argued that the fees were "grossly excessive [and] unacceptable by any standard" and that they "should be significantly reduced." That same day, the court granted John's motion and appointed Paul S. Franciszkowicz as GAL to represent the minor children.

¶ 9     On May 4, 2016, the court ordered Sohn to file a petition for fees, which he filed on June 7, 2016. In Sohn's petition, he alleged that it was John and John's attorneys who engaged in "unreasonable and contumacious conduct," which caused Sohn "extreme difficulties and delays *** in carrying out his duties as the Estate's attorney." Sohn alleged that, as a result of John's failure to perform his obligations to provide certain assets to decedent under the judgment in the dissolution action, Sohn was "compelled to undertake extraordinary efforts to recover said assets

for the Estate." Sohn stated that, through May 17, 2016, he had spent 759.49 hours in connection with the enforcement of the dissolution judgment, and 264.22 hours with respect to "other services rendered on behalf of the Estate." Sohn requested that the court enter an order granting him a total of $318,677.90 in attorney fees. In addition, Sohn claimed to have advanced $7,869.97 in costs in connection with the administration of the Estate. Sohn attached billing timeslip details regarding his legal services showing an hourly rate between $300 and $330, as well as various correspondence between Sohn and John's attorney, in which Sohn accused John and his attorneys of failing to fulfill their obligations, and John's attorney expressed concerns, among other things, that Sohn was "churning a file."

¶ 10 On July 28, 2016, the GAL filed objections to Sohn's petition for attorney fees. The GAL alleged that, despite the requirement that the executor seek court approval before paying attorney fees out of the estate, a review of Sohn's monthly invoices indicated that payments had been made to Sohn in the amount of $286,293.30. The GAL asked that Sohn's fees be denied based on his failure to seek court approval beforehand. The GAL further argued that, by failing to seek court approval for Sohn's actions, the estate incurred attorney fees for actions that may not have been approved had court approval been sought. Finally, the GAL argued that Sohn's fees were unreasonable and did not provide a reasonable benefit to the estate.

¶ 11 Regarding the reasonableness of Sohn's fees, the GAL alleged that Sohn engaged in various unnecessary services, and that many difficulties and a "majority of fees" resulted from Sohn's "lack of knowledge of domestic relations law." The GAL pointed out that Sohn's fee petition was seeking $244,813.50 in fees specifically related to the domestic relations matter and asset transfers, while John's attorneys billed only $40,000 during the same time period. These amounts included, for example, a six-month time period from April 2013 to September 2013 in

which Sohn billed the estate $28,000 for services rendered in the domestic relations matter while John's attorneys billed nothing. The GAL also asserted that Sohn failed to provide any benefit to the estate, as the vast majority of the estate consisted of assets obtained from John that John had agreed to turn over "from the onset of the decedent's estate," and the rest of the assets were collected through the efforts of attorneys retained by John, not through Sohn's services. Finally, the GAL pointed out that the executor's accounting alleged that the total value of the estate was approximately $1.3 million, arguing that Sohn's more than $300,000 in requested fees was excessive in light of the value of the estate.

¶ 12    On October 6, 2016, Sohn filed a response to the GAL's objections.  Sohn asked the court to "disregard" those objections, because they were based on a "completely mistaken and otherwise distorted perception of the facts." Sohn disputed the GAL's claim that John was "always ready and willing to turn over the assets pursuant to the judgment," arguing that it was John's "unfounded claims in the post-judgment proceedings and in the probate court" that required much of Sohn's efforts.

¶ 13    On April 25, 2017, the probate court entered an order granting Sohn leave to file an amended fee petition and directing that the previously filed objections would stand as to any amended fee petition.

¶ 14    On May 3, 2017, Sohn filed an amended petition for attorney fees. The petition was substantially the same as his previous petition, with changes to the hours expended and accompanying billing exhibits. Sohn alleged that he had rendered 733.77 hours in connection with the enforcement of the dissolution judgment and 264.22 hours "with respect to other services rendered on behalf of the Estate." Sohn sought entry of an order allowing Sohn the total sum of

5

$325,100.05 as and for his attorney fees rendered on behalf of the estate and reimbursement of expenses in the amount of $7,869.97.

¶ 15    From October 30, 2017 to November 2, 2017, the probate court held a four-day hearing on Sohn's amended fee petition.

¶ 16    At that hearing, Sohn called attorney Candace Meyers as "an expert witness in the area of domestic relations attorney's fees." Meyers had never testified regarding attorney fees, other than her own, and had not previously been declared an expert by any court in Illinois. After going through time entries and documents received from Sohn's files, Meyers determined that Sohn's "representation of the estate in domestic relations was reasonable. He did a thorough job." Meyers further opined that Sohn was "a very fine technician," and that he "did a good job accounting for the time that he had expended."

¶ 17    On cross-examination, Meyers testified that she met Sohn at an attorney networking group a year prior to her testimony. Meyers anticipated that she would charge between $10,000 to $11,000 in fees for her expert opinion in this case. Meyers admitted that she "did not practice at all in probate," and that she took no position with respect to any of the fees that were charged in the probate matter. Meyers only went through the domestic relations time entries, and was unaware of whether Sohn had multiple entries that he put on both the domestic relations and probate bills, and for which he had charged twice.

¶ 18    Sohn testified that he had been licensed to practice law for almost 49 years. Sohn admitted that he had never practiced in domestic relations before this matter, but viewed it as a matter of contract law. Sohn filed a petition to intervene in the domestic relations proceeding, which was granted by the probate court. In the domestic relations case, Sohn filed a petition for rule to show cause in an attempt to enforce the judgment, and sought a hearing on the petition for rule to show

cause but it never proceeded to a hearing. Sohn further testified that, after a number of requests by email and conversations, he filed a request for production of documents and then a subsequent motion to compel production of documents in relation to John's obligations under the marital settlement agreement. After finally receiving the requested documents in September 2013, Sohn learned that John had exercised options and sold stock that was supposed to be split with decedent.

¶ 19 Sohn requested a total of approximately $320,000 in fees (approximately $220,000 for the domestic relations work and approximately $100,000 for the probate work). Sohn requested that the court ratify those fees, as Sohn had already received all of the requested fees prior to Sohn's filing of his fee petition.

¶ 20 Sohn acknowledged that supervised administration required him to seek court permission prior to taking action on behalf of the estate "as to some matters." He denied that supervised administration required court approval to take attorney fees, testifying to his belief that decedent's will "preempt[ed]" the Act. Sohn further testified that he stopped taking fees after the GAL was appointed, because the GAL indicated that he should file a petition for fees.

¶ 21 Sohn testified that he filed two current accounts of the estate during the five-year period from 2012 to 2017. Sohn admitted that the first current account of the estate, covering the period June 15, 2012 through September 30, 2015, and all of the actions therein, were never approved by any court. Other than the payment of child's awards for the benefit of decedent's minor children in the statutory minimum amount, no disbursements had been made to the minor children.

¶ 22 When Sohn was asked if he was aware that an executor is prohibited from making transactions with the estate in which he financially benefits, Sohn replied that he was "not sure that that's always the case." Sohn acknowledged that the executor sold certain shares of stock that were assets of the estate, and that he did not seek a court order allowing the sale of those shares.

7

Sohn further acknowledged that at that time, the estate had only $14,000 of cash on hand. When asked about whether the executor selling the stock "made *** cash available to continue to pay your bills in this matter," Sohn responded, "I guess it did."

¶ 23 Also without court permission, Sly, as executor, sold decedent's personal property to various parties, including Sly individually, and Elnora Davis, the mother of both decedent and Sly's wife, Cindy. Sohn did not know whether any of the personal property that Sly purchased for himself was offered to the minor children, and Sohn admitted that he did not contact John or his attorney to offer any personal property from decedent's home.

¶ 24 Sohn opined that, at its "high point," the estate was valued at "[s]omewhere in the area of a million dollars." In addition to Sohn's requested attorney fees, Sohn testified that he had filed a petition for the executor to be paid $120,000 in executor's fees, including fees for Sly's wife, Cindy Sly, for "helping" Sly. Between Sohn's fees of $320,000 and executor fees of $120,000, the total administrative fees amounted to $440,000.

¶ 25 Regarding his bills, Sohn testified that he submitted time slip entries as two different exhibits, one for his work in the domestic relations matter, and the other for work "for purposes of the estate." On cross-examination, Sohn was questioned about several alleged inconsistencies between what appeared on his time slip entries and the bills that were sent to the executor. Sohn testified that it was possible that his time entries did not all match the bills sent to the executor, and acknowledged several mistakes, duplicates, and occasions on which the same time entries were included in his time slips in both the estate and domestic relations matters. Sohn also admitted to submitting several bills to the executor that did not indicate any time associated with, or description of, the work done.

¶ 26    The GAL called Vincent Stark, an attorney from the law firm Kamerlink, Stark, Powers & McNicholas, as a witness. At the time of the trial, Stark had been practicing in family law for 29 years.

¶ 27    Stark represented John in his divorce from decedent, which ended with a settlement. A day or two after the divorce judgment was entered, decedent was diagnosed with a malignant cancer and subsequently filed a motion to vacate the judgment. About one year later and about one week before decedent's death, she voluntarily withdrew her motion to vacate, at which point the judgment order became final. Stark testified that, at that point, what needed to happen next was the actual asset division contained in the judgment, which he considered a "simple" matter.

¶ 28    With respect to the qualified domestic relations orders (QDROs) that were required to be prepared to divide the decedent's and John's retirement accounts, Stark testified that they "would have been [simple], but it did not turn out that way." Stark had many interactions with Sohn regarding the preparations of the QDROs. Sohn "didn't have any idea what a QDRO was or how to implement a QDRO," so Stark "had to educate him on a QDRO and what had to be done." Stark further testified that his firm "had to basically do everything on the QDRO" due to Sohn's lack of knowledge. However, once the QDRO that Stark's firm prepared was ready to be entered, Stark discovered that decedent's account had been liquidated by decedent's mother prior to division. Although John's probate attorney, Michael Wood, took action to collect John's half of the decedent's 401(k) from the decedent's mother, Stark testified that Sohn took no action to collect the estate's half of decedent's 401(k) from decedent's mother.

¶ 29    Stark also testified that Sohn's numerous requests for financial records, including for records predating the divorce judgment, were unreasonable, especially given that the only differences in the statements were fluctuations in market value.

¶ 30    Stark next testified to an issue regarding stock transfer forms. Stark stated that Sohn should have completed the forms for his client, but it "didn't happen." Stark further testified that "every time you would get something back [from Sohn] something would be wrong with the document. There would be misspellings, or something not contained in the document that should be in the document and that always became a problem." Stark's firm ultimately completed the stock transfer forms, because they "wanted the case over."

¶ 31    Stark also testified that Stark's firm had sent over a box of financial documents to Sohn for him to review about two weeks before a settlement conference, but it became clear at the beginning of the settlement conference that Sohn had never even opened or reviewed the box of documents beforehand.

¶ 32    Stark additionally testified that the matter became complicated by the way Sohn "wanted to settle the case," as Sohn "would just not let go of" two primary issues, for which he had no legal authority. First, Sohn believed that the divorce judgment was "a monetary judgment of which [the decedent] was entitled to nine percent interest on all of the assets awarded to her going back to the date of the judgment." Stark testified that the nine percent statutory interest on monetary judgments is not a standard for domestic relations matters and would only apply if there is a "monetary judgment within a divorce decree." Further, Stark testified that there was no monetary judgment in this matter and that Sohn never provided Stark with any authority as to why he was claiming the nine percent statutory interest. Ultimately, after settlement, the estate did not receive any statutory interest.

¶ 33    Next, Stark explained that Sohn took the position that the estate was entitled to the gross proceeds of liquidation, rather than a net distribution after taxes, based on a mistaken belief that the liquidation of assets was a tax-free "1041 transaction." However, Stark testified that the

liquidation of assets here did not qualify as a "1041 transaction" because "there [were] not two spouses here" and this was "not a transfer" but a "liquidation" in which taxes had to be paid. After mediation, a net distribution after taxes was paid to the estate.

¶ 34    Stark testified that, as part of his practice, he did "a lot of fee defense work." Stark's opinion, "as an attorney practicing in this area for 29 years," was that Sohn's fee petition was not reasonable. Sohn explained that the issues involved were simple, and that it was Sohn who complicated the matter.

¶ 35    As to Sohn's fees, Stark testified that his firm's own fees were "not even close to [Sohn's] fees" and that they were "maybe one fifth, one sixth, [or] one seventh of his fees." Stark opined that Sohn had no basis to file either a 508(a) or 508(b) fee petition in the domestic relations division. Although Sohn filed petitions for fees under both sections, Stark testified that Sohn withdrew his 508(a) request, and the domestic relations judge denied his 508(b) petition, agreeing that there was no basis for such fees.

¶ 36    The GAL next called John, who testified that decedent was his former wife, and that they shared two minor children, then 13 and 16 years old, who were the sole heirs to decedent's estate.

¶ 37    John testified that he had to turn over certain things to his ex-wife as part of the divorce decree. John offered to turn over the amount of the assets listed in the settlement agreement, but Sohn refused, insisting that John pay interest, and that John sell shares of stock that were to be transferred and be responsible for the taxes associated with the sale. John further testified that he found Sohn's insistence "unusual," and that the divorce judgment did not provide for interest or shifting tax burdens. John also confirmed a meeting had been stopped after it became clear that Sohn was unprepared and had not reviewed a box of records provided to him ahead of time.

¶ 38    John testified that the decedent had "a lot of jewelry," including a wedding ring, engagement ring, "probably ten watches" including a Rolex, multiple bracelets, pearl necklaces, and diamond earrings. Sly, as executor, never offered John or his children any items of jewelry, photographs or keepsakes from decedent's home for the children to remember her. The only items the children received were bedroom furniture and a small variety of toys. John witnessed a garage sale during which toys were sold, but John was never notified by the executor or Sohn about the garage sale. None of decedent's jewelry was given to his daughter, although John testified that he would have loved for her to have some of her mother's jewelry.

¶ 39    In comparison to Sohn, who charged over $220,000 in fees related to the domestic relations matter, John testified that he had been charged approximately $40,000 in fees by his divorce attorney, Stark.

¶ 40    On January 17, 2018, the probate court issued a seven-page, single-spaced written order. The court noted that Sohn was seeking fees of approximately $324,000—comprised of $92,000 in probate fees and $232,000 for work in the domestic relations division on behalf of the estate—plus costs of $7,875.

¶ 41    The court initially set out section 5/28-8 of the Act, which provides that an "independent representative" may "employ *** counsel *** and pay them reasonable compensation." The court determined, however, that "when independent status is terminated, [the representative] loses the right to act without court order and approval," noting that the Act further provided that "[a]fter entry of an order terminating independent administration status, the independent representative may not exercise any power pursuant to this Article and is liable for any damages caused by any such exercise."

¶ 42    The court then found that, during the four years of supervised administration, Sohn "billed the Supervised Administrator on a monthly basis" and was paid by the estate for fees incurred in both the probate and domestic relations matters. Those billings "were paid without court approval, without authority for such payments and in contravention of the statute." The probate court expressed concern that it "had no opportunity to review the appropriateness, reasonableness, necessity or benefit to the estate prior to the fees being paid from estate assets," and was thus required to look back over a period of four years, and "review [whether] counsel's actions and the concomitant fees were reasonable and necessary."

¶ 43    Turning to the reasonableness of Sohn's fees, the probate court stated,

> "Based upon all of the evidence and this court's own experience with the administration of probate estates, the court concludes that most of the billings were unnecessary and unreasonable in light of the size of this estate, the complexity of the issues involved, the time spent and the knowledge and experience of estate counsel. The court further finds that the work resulted in little benefit to the estate."

¶ 44    The probate court explained that decedent's estate was "not a complicated estate to administer." The estate consisted of "four items: (1) a house that decedent owned at her death; (2) the personal property inside the home; (3) a cause of action against decedent's former husband based upon the couple's Judgment for Dissolution of Marriage; and (4) a claim against decedent's former boyfriend." Seven claims were filed against the estate, including three attorney fee claims; claims filed by the decedent's former boyfriend, decedent's mother, and John; and an approximately $100 claim filed by Ascension Point Recovery Services. In addition, John filed a petition for a statutory child's award and for funds for the future support, maintenance and education of the minor heirs.

¶ 45    The court concluded that the

> "estate administration was made unnecessarily complicated by the actions of the executor and the attorney for the estate. And the evidence established that much of counsel's time was spent 'spinning wheels' and not resolving issues or completing the administration of an uncomplicated probate estate. Any monetary benefit gained by resolution of claims or issues was 'eaten up' by fees."

¶ 46    The probate court further found that "issues were pursued and contests were instituted but not resolved at great cost to the estate for little or no benefit other than to generate more and more fees and to continually delay the proper administration of the estate." The probate court listed several examples of "unreasonable and unnecessary fees" that were charged by Sohn, including "nearly $2500 [charged] to prepare and file the 1 page inventory that listed the above-mentioned 4 items," and "nearly $6800 [charged] to handle the sale of the decedent's residence," which the court noted was "nearly seven (7) times the norm" based on the court's "experience of fees charged by estate counsel for residential real estate sale closings of single family homes" like the decedent's. The court further found that "there was no evidence that any complex issues were raised to justify" such a large fee. The court additionally noted that Sohn charged $8,000 to resolve a $17,000 claim by the decedent's former boyfriend; and nearly $10,000 to contest a $22,000 attorney fee petition. Finally, the probate court found,

> "Instead of resolving the issues regarding John Loessy's claims in the domestic relations division where they properly belonged, the supervised executor and attorney Sohn began a barrage of pleadings including Counterclaims and a Petition to Remove against John Loessy in the probate estate thereby litigating the same issues in two different venues. Page after page of attorney Sohn's probate billings

reflect entries of time in addressing issues regarding John Loessy and child support and counterclaims and his removal. Apparently one third of the total probate billings were spent on pleadings addressing issues that either were being addressed in the domestic relations matter or should have been addressed there."

¶ 47    Regarding the domestic relations case, the probate court observed that Sohn admitted he was not a domestic relations practitioner, and that this was the first such matter he had ever handled. The probate court further found, "[a]s in the probate estate administration, the evidence established that much of counsel's time was spent 'spinning wheels' and not efficiently resolving the transfer issue," rejecting Sohn's attempts to blame John and his counsel for the large legal fees. The court noted that in, Sohn's testimony, "he went to great lengths to describe the lack of cooperation and unreasonableness that he felt was exhibited by John Loessy and his counsel and blames them for the extraordinary amount of time that he billed." The court observed, however, that Sohn had petitioned the domestic relations court to order John to pay the estate's attorney fees but that the request was denied, and the denial was affirmed on appeal. "If, in fact, John Loessy's actions in failing to transfer the assets at issue were as unreasonable as asserted by attorney Sohn, then the domestic relations division could have and should have found him liable for the fees incurred."

¶ 48    The probate court also rejected Sohn's argument that "by achieving the transfer of the assets [that were to be transferred by John to decedent pursuant to the terms of their dissolution Judgment] he effectively 'recovered' them into the estate thereby benefiting the estate in the amount of their value." The court differentiated "the enforcement of a judgment with the recovery of an estate asset," noting that in this case, "the terms of the Judgment had been agreed to long ago" and "[t]he only thing left to do at [decedent's] death was to enforce the terms of the Judgment,

not rewrite it. Enforcement of a judgment is a far cry from the work necessary to recover assets pursuant to Section 16 of the Probate Act." The probate court further observed that "the domestic relations matter was ultimately resolved by mediation and the end result was the transfer of the exact six assets listed above at their present day values. *** There is no evidence that the years of litigation resulted in any additional benefit to this estate."

¶ 49 Finally, the court observed that the fees requested by Sohn equaled "almost a third of what he and the supervised administrator assert the value of the estate to be," and that the figure included "the value of the assets 'recovered' from John Loessy." The court observed that such a request was unusual, as it was "[r]arely *** asked to consider fee petitions that equal even one tenth of the value of an estate."

¶ 50 In sum, "[b]ased upon all the evidence presented, including the value of this estate and the reasonable and necessary fees to properly administer it," the probate court found "reasonable and necessary fees in the amount of $135,000" as well as the full amount of "costs billed and paid." The court found, however, that based upon the two accountings, Sohn had already received $320,000. The court therefore ordered Sohn to repay the estate $185,000, "said sum having been paid to him by the supervised administrator of this estate without court approval." The court entered judgment for the estate and against Sohn in the amount of $185,000.

¶ 51 On January 19, 2018, Sohn filed a Section 5/2-1203 motion for a rehearing and/or for modification of the judgment or to vacate the judgment entered on January 17, 2018, arguing that the probate court misapplied the law. Sohn specifically argued that the matters litigated in the case "were multiple and complex," that John "was the primary cause of the extensive litigation required," and that the court "inexplicably *** ignored the substantial benefit achieved by Sohn and the executor in the recovery of assets from John." Additionally, Sohn contended that the court

16

incorrectly determined that the executor was required to obtain court approval before paying Sohn's fees, arguing that the executor's powers derived from the decedent's will, and not the Act.

¶ 52    On January 23, 2018, the GAL filed his response to Sohn's motion for a rehearing, and on January 24, 2018, the probate court entered an order denying Sohn's motion. Sohn filed a timely notice of appeal from that order on February 21, 2018, and this court has jurisdiction pursuant to Illinois Supreme Court Rule 304(b)(1) (eff. Mar. 8, 2016).

¶ 53    In this court, Sohn argues that the probate court made findings of fact that were manifestly erroneous, and that the court abused its discretion in failing to award him the full value of his fees and in denying his motion to reconsider.

¶ 54    The Act allows representatives of an estate "reasonable compensation" for their services. 755 ILCS 5/27-1 (West 2016). "In actions to recover compensation for legal services, the burden of proof rests with the attorney to establish his case." *In re Estate of Coleman*, 262 Ill. App. 3d 297, 299-300 (1994). The trial court has broad discretion to determine the reasonableness of compensation claimed by an attorney representing an executor, and the court's fee determination will not be reversed unless the determination is manifestly erroneous (*id*. at 299), or a clear abuse of discretion (*In re Estate of Callahan*, 144 Ill. 2d 32, 44 (1991)). "A plain case of wrongful exercise of judgment would be necessary to justify a reversal." *In re Estate of Marks*, 74 Ill. App. 3d 599, 604 (1979). A reviewing court may not disturb the trial court's determination merely because it may have weighed the factors differently or awarded a different sum. *In re Estate of Callahan*, 144 Ill. 2d at 45.

¶ 55    The ultimate determination must be based on the facts and circumstances of the particular case before the court. *In re Estate of Miller*, 197 Ill. App. 3d 67, 71 (1990). Factors to consider in determining what is "reasonable compensation" include "the size of the estate, the work involved,

the skill evidenced by the work, [the] time expended, the success of the efforts involved, and the good faith and efficiency with which the estate was administered." *In re Estate of Thorp*, 282 Ill. App. 3d 612, 619 (1996). These factors apply to the compensation for both attorneys and executors. *In re Estate of Weeks*, 409 Ill. App. 3d 1101, 1110 (2011). Additionally, the trial court is not bound by the opinion of expert witnesses as to the reasonableness of fees claimed, but may rely on its own knowledge and experience and use independent judgment in setting the amount of compensation. *In re Estate of Marshall*, 167 Ill. App. 3d 549, 553 (1988) (citing *In re Estate of Brown*, 58 Ill. App. 3d 697, 707 (1978)).

¶ 56    In this case, the probate court gave ample consideration of the relevant factors in concluding that only $135,000 of Sohn's $320,000 in requested fees were reasonable. Based on the probate court's experience and the evidence presented, it found that decedent's estate "was not a complicated estate to administer," and that there were no complex issues involved that would justify the large fee requested.

¶ 57    There was evidence presented at the hearing that indicated that the value of the estate fell somewhere between $860,000 and $1.3 million, and Sohn himself, testified that the value of the estate, at its high point, was approximately $1 million. In its order, the court noted that Sohn's fees equaled "almost a third of what he and the supervised administrator assert the value of the estate to be." The court further noted that this figure was largely comprised of assets that decedent was owed under the dissolution judgment, and that the work required to enforce a judgment would generally be far less than the work required to otherwise recover estate assets. The court also observed, based on its knowledge and experience, that it was "[r]arely *** asked to consider fee petitions that equal even one tenth of the value of an estate."

18

¶ 58    Regarding the skill involved, and the good faith and efficiency with which the estate was administered, the court concluded that the administration of the decedent's estate was made unnecessarily complicated by Sohn's actions, and that much of Sohn's time "was spent 'spinning wheels' and not resolving issues or completing the administration of an uncomplicated probate estate." In the domestic relations matter, the court observed that this was the first domestic relations matter Sohn had ever handled, and, like in the probate matter, much of Sohn's time was spent "spinning wheels" and not efficiently resolving the transfer issue. The court further found that Sohn pursued issues "at great cost" and with "little or no benefit" to the estate, with the apparent purpose to "to generate more and more fees and to continually delay the proper administration of the estate."

¶ 59    Also as to good faith, the court observed that Sohn had failed to seek court approval for attorney fees prior to receiving them, despite the fact that this matter was a supervised administration. Instead, Sohn was able to receive more than $300,000 in attorney fees, paid by the estate, with no oversight by the probate court.

¶ 60    In this appeal, Sohn disagrees with the probate court's assessment of the complexity of the issues involved in this matter and characterization of the services he provided. Sohn contends that the court's conclusions that he provided little to no value to the estate, and that he was "spinning wheels" and doing unnecessary work, were manifestly erroneous. Sohn lays out the various services that he alleges were reasonable and necessary to engage in on behalf of the estate in his appellate brief, and claims that the "overwhelming evidence" showed that Sohn's legal services were "necessary and reasonable," and that the "delay and multiplication of litigation was caused exclusively by John."

¶ 61     We note, however, that the issues Sohn raises were before the probate court, which heard extensive conflicting evidence during the four-day hearing on Sohn's amended petition for fees. Merely because the court chose not to accept the opinions of Sohn and his expert witness does not suggest that the court's determination was either manifestly erroneous or an abuse of discretion. The probate court in this case was well aware of the nature of the proceedings and had the necessary skill and experience to determine a fair and reasonable compensation for legal services, and to approximate the time various tasks require. *In re Estate of Bitoy*, 395 Ill. App. 3d 262, 272-73 (2009). Therefore, the court may accept or reject the opinion of expert witnesses as to what fees are reasonable, and the court is not bound by a petitioning attorney's opinion on the issue. *Estate of Healy*, 137 Ill. App. 3d 406, 411 (1985).

¶ 62     Moreover, the trial judge is in a superior position to determine the credibility of the witnesses and the weight to give their testimony. *Magnone v. Chicago & North Western Transportation Co.*, 126 Ill. App. 3d 170, 176 (1984). On appeal, a reviewing court will take questions of testimonial credibility as resolved in favor of the prevailing party and must draw from the evidence all reasonable inferences that support the judgment. *Apollo Heating & Air Conditioning Corp. v. American National Bank & Trust Co.*, 135 Ill. App. 3d 976, 978-79 (1985). A reviewing court will not substitute its judgment unless the trial court's decision is not supported by the evidence. *Aetna Insurance Co. v. Amelio Brothers Meat Co.*, 182 Ill. App. 3d 863, 865 (1989).

¶ 63     Sohn challenges the court's assessment of his services, claiming that his "efforts on behalf of the Estate were very successful," and that he was "able to enforce a judgment against John and recover in excess of $1,000,000 for the Estate." However, as the probate court observed, Sohn's attempts to take credit for the full value of assets transferred by John are unconvincing, as the

20

dissolution judgment had been agreed to between decedent and John prior to Sohn's involvement, and all that remained after decedent's death was the enforcement of that judgment. There was evidence before the court that John had been willing to comply with his obligations under the dissolution judgment, that Sohn refused John's offer and insisted that John pay additional taxes and interest, and that years of litigation resulted from Sohn's insistence. Ultimately, the years of litigation did not result in any additional benefit to the estate beyond what John had already agreed to turn over, as the estate ultimately received the "transfer of the exact six assets listed above at their present day values" without any interest or tax shifting.

¶ 64    Finally, Sohn argues that the court erred in concluding that the Act requires court approval prior to the payment of attorney fees, contending instead that decedent's will allowed the executor to pay attorney fees from the estate.

¶ 65    Pursuant to Article 28 of the Act, titled "Independent Administration of Decedent's Estates," an *independent representative* is generally authorized to pay reasonable attorney fees without court approval, so long as that authorization is consistent with the will. See 755 ILCS 5/28-8(g) (West 2016) ("An independent representative acting reasonably for the best interests of the estate has the powers granted in the will and the following powers, *all exercisable without court order*, except to the extent that the following powers are inconsistent with the will: *** (g) To employ *** counsel, including legal *** counsel *** and to pay them reasonable compensation." (emphasis added)). In this case, decedent's will allowed the executor to "consult with legal counsel *** at estate expense." Accordingly, by operation of decedent's will and section 5/28-8(g), the executor would have had the power to pay Sohn's attorneys' fees without court order, *if decedent's estate had been under independent administration.*

21

¶ 66    However, when independent administration is terminated and an estate is converted to supervised administration, the representative is no longer authorized to exercise powers pursuant to Article 28, including paying attorney fees without court order. See 755 ILCS 5/28-4(c) ("After entry of an order terminating independent administration status, the independent representative may not exercise any power pursuant to this Article [28] and is liable for any damages caused by any such exercise.") Accordingly, after decedent's estate was converted to supervised administration, the executor could no longer pay attorney fees from the estate without court approval. See *In re Estate of Blickenstaff*, 2012 IL App (4th) 120480, ¶ 57 ("The executor should not have paid any attorney fees whatsoever out of the estate without first obtaining the trial court's approval for each such payment \*\*\*. The executor and his attorneys were on notice, from case law, that court approval was required before the payment of any attorney fees out of the estate. Insomuch as the trial court finds these attorney fees to be unreasonable or not beneficial to the estate, the executor and possibly his attorneys, too, will have to reimburse the estate."); *Estate of Thomson*, 139 Ill. App. 3d 930, 939 (1986) ("[T]he statute clearly contemplates that the representative will seek court approval prior to paying such fees [to estate representatives and attorneys].").

¶ 67    Sohn disagrees that court approval was required, contending that in *In re Estate of Coleman*, 262 Ill. App. 3d 297 (1994), the appellate court concluded that an attorney's failure to seek approval for attorney fees paid did not preclude the court from awarding them.

¶ 68    Initially, we note that *Coleman* is meaningfully distinguishable from the case at bar as there is no indication that the case involved supervised administration. Nonetheless, the court here did not determine that Sohn was precluded from receiving fees because of his failure to seek approval beforehand. Like in *Coleman*, the probate court here went on to consider whether the requested

22

fees were reasonable, despite the failure to seek approval for them before they were paid. Finally, we question Sohn's reliance on *Coleman*. If anything, *Coleman* confirms that payment of attorney without notice or approval is generally disfavored, as the court found that the probate court's determination that the attorney demonstrated a lack of good faith by accepting payment of $75,000 in fees without approval or notice to the heirs to be "well supported by the evidence," and, among other things, supported the decision to award the attorney only approximately $16,000 of the $80,000 in fees he sought. *Id.* at 298, 301.

¶ 69    In sum, we conclude that the probate court carefully weighed all relevant factors in determining what portion of Sohn's requested attorney fees were reasonable and necessary, and that the court based its decision on a reasonable interpretation of the evidence presented at the four-day hearing. In these circumstances, we find no abuse of discretion or manifest error in the trial court's decision to award Sohn $135,000 in attorney fees, and to deny the remaining $185,000 in fees requested.

¶ 70    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 71    Affirmed.